Filed 8/17/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MARIN ASSOCIATION OF PUBLIC EMPLOYEES et al., <br><br>    Plaintiffs and Appellants, <br><br> v. <br><br> MARIN COUNTY EMPLOYEES' RETIREMENT ASSOCIATION et al., <br><br>    Defendants and Respondents; <br><br> THE STATE OF CALIFORNIA, <br><br>    Intervenor and Respondent. | A139610 <br><br> (Marin County <br> Super. Ct. No. CIV 1300318) |

The practice known as "pension spiking," by which public employees use various stratagems and ploys to inflate their income and retirement benefits, has long drawn public ire and legislative chagrin. Effective January 1, 2013, the Legislature amended Government Code[1] section 31461, a provision of the County Employees Retirement Law, with the aim of curtailing pension spiking by excluding specified items from the calculation of retirement income. A number of individuals currently employed by various governmental entities in the County of Marin, together with a number of organizations representing current county employees, brought suit to halt implementation of the revised formula. The trial court concluded application of the new formula to current employees did not amount to an unconstitutional impairment of the employees' contracts, and sustained the pension authority's general demurrer without leave to amend.

---

[1] Statutory references are to the Government Code unless otherwise indicated.

1

After an extensive independent review, we reach the same conclusion and affirm, holding that the Legislature did not act impermissibly by amending section 31461 to exclude specified items and categories of compensation from the calculation of pensions for current employees.  As will be shown, while a public employee does have a "vested right" to a pension, that right is only to a "reasonable" pension—not an immutable entitlement to the most optimal formula of calculating the pension.  And the Legislature may, prior to the employee's retirement, alter the formula, thereby reducing the anticipated pension.  So long as the Legislature's modifications do not deprive the employee of a "reasonable" pension, there is no constitutional violation.  Here, the Legislature did not forbid the employer from providing the specified items to an employee as compensation, only the purely prospective inclusion of those items in the computation of the employee's pension.  Neither the statutory change, nor the implementation of that change by the county pension agency, amounts to an impairment of the employee's receipt of a "reasonable" pension upon retirement.

## BACKGROUND

### The Statutory Framework and the Emergence of the Unfunded Pension Liability Crisis

The County Employees Retirement Law of 1937 (Stats. 1937, ch. 677 (CERL)), as codified in 1947 (§ 31450 et seq.) allows, but does not require, a county to establish and operate a retirement plan for its employees.  Twenty of the state's 58 counties have elected to do so.  Each county plan is administered by a retirement board, which, as we previously characterized it, is "required to determine whether items of remuneration paid to employees qualify as 'compensation' under section 31460 and 'compensation earnable' pursuant to section 31461, and therefore must be included as part of a retiring employee's 'final compensation' (§ 31462 or § 31462.1) for purposes of calculating the amount of a pension."  (*In re Retirement Cases* (2003) 110 Cal.App.4th 426, 433.)

In the aftermath of the severe economic downturn of 2008–2009, public attention across the nation began to focus on the alarming state of unfunded public pension liabilities.  (E.g., U. S. Cong., Congressional Budget Off., The Underfunding of State and

Local Pension Plans (May 2011) p. 1 [estimating unfunded liabilities as of 2009 at "between $2 trillion and $3 trillion"]; Report of the State Budget Crisis Task Force (2012) p. 2 ["Pension funds for state and local government workers are underfunded by approximately a trillion dollars according to their actuaries and by as much as $3 trillion or more if more conservative investment assumptions are used"]; Novy-Marx & Rauh, *Public Pension Promises: How Big Are They and What Are They Worth?* (2011) 66 J. Fin. 1206, 1211 [estimating "state employee pension liabilities as of June 2009" at between $3.2 trillion to $4.43 trillion].) One legal commentator characterized unfunded pension obligations as the "ticking fiscal time bomb for state and local governments." (Beermann, *The Public Pension Crisis* (2013) 70 Wash. & Lee L.Rev. 3, 13; cf. Rauh, *The Pension Bomb*, Milken Inst. Rev. (2011) 28 ["Many pension systems are rapidly approaching a day of reckoning.")

As so often occurs, California was in first place: "The state with the biggest absolute level of underfunding is California, with underfunding of approximately $475 billion." (Novy-Marx & Rauh, *The Liabilities and Risks of State-Sponsored Pension Plans* (2009) 23 J. Econ. Persp. 191, 197–199.) In 2010, the Stanford Institute for Economic Policy Research, studying only the California Public Employees' Retirement System, the California State Teachers' Retirement System, and the University of California Retirement System, estimated "the current shortfall at more than half a trillion dollars." (Howard Bornstein, et al., *Going for Broke: Reforming California's Public Employee Pension Systems*, SIEPR Policy Brief (April 2010) p. 2; see also Nation, *The Funding Status of Independent Public Employee Pension Systems in California*, SIEPR Policy Brief (Nov. 2010) pp. 1, 13 [examining 24 systems operating under CERL which "account for approximately 91 percent of the total assets and liabilities for independent systems" and estimating their "aggregate unfunded liability . . . at nearly $200 billion in June 2008"].) "The magnitude of the problem in California . . . is staggering" and "is without peer." (Hylton, *Combating Moral Hazard: The Case for Rationalizing Public Employee Benefits* (2012) 45 Ind. L.Rev. 413, 444.)

In 2011, the Little Hoover Commission advised the Governor and the Legislature: "California's pension plans are dangerously underfunded, the result of overly generous benefit promises, wishful thinking and an unwillingness to plan prudently. Unless aggressive reforms are implemented now, the problem will get far worse, forcing counties and cities to severely reduce services and layoff employees to meet pension obligations." The Commission urged a number of "structural changes that realign pension costs and expectations of employees, employers and taxpayers." (Little Hoover Com., Public Pensions for Retirement Security (Feb. 2011) [cover letter of Chairman Daniel Hancock].) The situation was described as "dire," "unmanageable," a "crisis" that "will take a generation to untangle," and "a harsh reality" that could no longer be ignored: "The money coming in is nowhere near enough to keep up with the money that will need to go out." (*Id*., pp. v, 38, 12, 21, 25.)

"The state must exercise its authority—and establish the legal authority—to reset overly generous and unsustainable pension formulas for both current and future workers." (Little Hoover Com., Public Pensions for Retirement Security, *supra*, p. 53.) And because "State and local governments have made a promise to workers they can no longer afford," the commission recommended: "To provide *immediate savings of the scope needed*, state and local governments must have the flexibility to alter future, unaccrued retirement benefits for current workers." (*Id*., p. 42, italics added.)

One feature of the system that drew the commission's critical attention was "pension spiking," which the commission defined as follows: "The practice of increasing [an employee's] retirement allowance by increasing final compensation or including various non-salary items (such as unused vacation pay) in the final compensation figure used in the [employee's] retirement benefit calculations, and which has not been considered in prefunding of the benefits." (Little Hoover Com., Public Pensions for Retirement Security, *supra*, p. 73.) The commission found the practice had become "widespread throughout local government," and had generated "public outrage [that] . . .

4

cannot continue to be ignored."[2]  (Little Hoover Com., Public Pensions for Retirement Security, *supra*, pp. 36, vi.)  "The spiking games must end.  Pensions must be based only on actual base salary . . . not padded with other pay for clothing, equipment or vehicle use, or enhanced by adding service credit for unused sick time vacation time or other leave time."  (*Id*., at p. 46.)

## The Pension Reform Act

The Legislature heard, and agreed.[3]  The following year, it passed Assembly Bill No. 340 (AB 340), enacting the California Public Employees' Pension Reform Act of

---

[2] One commentator correlated public anger to timing and perception:  "Public employee pensions are usually based on the employee's pay at the end of the career, often the average of the employee's last three or five years of government employment. Employees make efforts to increase their pay at the end of their careers to 'spike' their pensions.  Even if the methods employees use . . . are within the rules of the pension system, *they seem illegitimate*" because of the appearance that the pension system is being "manipulated" just as the employee's working career for the public concludes. (Beermann, *The Public Pension Crisis*, *supra*, 70 Wash. & Lee L.Rev. at p. 21, italics added.)

The Legislature's amendment of section 31461 had similar motivations: "According to the author, 'California's public pension systems' " " 'have been tainted by a few individuals who have taken advantage of the system.  This is in part due to the '37 Act's very broad and general definition of 'compensation earnable' . . . .' [¶]  . . . [¶] The author concludes, 'This measure will address these abusive practices . . . .' Supporters state, 'AB 340 would eliminate the current . . . ability for employees to manipulate their final compensation calculations . . . .' " (Assem. Com. on Public Employees, Retirement and Social Security, Analysis of Assem. Bill No. 340 (2011–2012 Reg. Sess.) as amended April 25, 2011, p. 4; Sen. Com. on Public Employment and Retirement, Analysis of Assem. Bill No. 340, (2011–2012 Reg. Sess.) as amended June 22, 2011, pp. 4–5 [same].)

[3] The Legislature was already aware of abuse, having repeatedly attempted to limit how compensation earnable was being defined in Los Angeles.  (See Stats. 1993, ch. 396, § 4, adding § 31461.1 [allowing exclusion of "cafeteria or flexible benefit plan contributions, transportation allowances, car allowances, or security allowances"]; Stats. 1999, ch. 7, § 1, adding § 31461.4 [excluding, as an urgency measure, "any increase, made on or after January 1, 1996, in cafeteria or flexible benefit plan contributions for any member represented by a certified employee organization, nor shall they include any increase in cafeteria or flexible benefit plan contributions made on or after January 1, 1995, for any member not represented by a certified employee organization, provided that

2013 (Pension Reform Act), which made fundamental alterations in the manner in which public pensions are calculated. (§ 7522 et seq.; Stats. 2012, ch. 296.) Concurrent with that effort, the Legislature enacted Assembly Bill No. 197 (2011–2012 Reg. Sess.) (AB 197), with the declared purpose to "exclude from the definition of compensation earnable any compensation determined by the [county retirement] board to have been paid to enhance a member's retirement benefit."[4] (Legis. Counsel's Dig., Assem. Bill No. 197 (2011–2012 Reg. Sess.); Stats. 2012, ch. 297.) To this end, both A.B. 340 and A.B. 197 amended section 31461 by adding subdivision (b):

"(b) 'Compensation earnable' does not include, in any case, the following:

"(1) Any compensation determined by the board to have been paid to enhance a member's retirement benefit under that system. That compensation may include:

"(A) Compensation that had previously been provided in kind to the member by the employer or paid directly by the employer to a third party other than the retirement system for the benefit of the member, and which was converted to and received by the member in the form of a cash payment in the final average salary period.

---

the nonrepresented member waives the applicability of Sections 31460 and 31461 in writing prior to receiving any cash payment based on the increase"]; Stats. 2001, ch. 778, § 1, adding § 31461.45 [" 'Compensation earnable' in a county of the first class shall include only those items of remuneration specifically included as a result of the court-approved settlement in . . . Judicial Council Coordination Proceeding No. 4049 . . . . Those items of remuneration . . . shall include only the following [111 specified bonuses, allowances, and differentials]"].) The Legislature had also imposed other statewide exclusions for county employees. (See Stats. 1998, ch. 129, § 1, adding § 31461.5 ["salary bonuses or any other compensation incentive payments for regular duties or for additional services outside regular duties"]; Stats. 2000, ch. 966, § 3, adding § 31461.6 ["overtime premium pay"].)

[4] " 'Member' means any person included in the membership of the retirement association" (§ 31470), which in turn "means an association of all persons who may qualify as annuitants or beneficiaries" under CERL (§ 31474). In plain English, and excluding survivor beneficiaries, a "member" is a past or present "employee" (§ 31469) of a "public agency" (§ 31478) who did or is rendering "public service" for compensation to that public agency (§ 31479).

"(B)  Any one-time or ad hoc payment made to a member, but not to all similarly situated members in the member's grade or class.

"(C)  Any payment that is made solely due to the termination of the member's employment, but is received by the member while employed, except those payments that do not exceed what is earned and payable in each 12-month period during the final average salary period regardless of when reported or paid.

"(2)  Payments for unused vacation, annual leave, personal leave, sick leave, or compensatory time off, however denominated, whether paid in a lump sum or otherwise, in an amount that exceeds that which may be earned and payable in each 12-month period during the final average salary period, regardless of when reported or paid.

"(3)  Payments for additional services rendered outside of normal working hours, whether paid in a lump sum or otherwise.

"(4)  Payments made at the termination of employment, except those payments that do not exceed what is earned and payable in each 12-month period during the final average salary period, regardless of when reported or paid."[5]

There is no dispute that the purpose of this change was to curtail pension spiking.[6]

_____

[5] There was one exception:  "Compensation that a member was entitled to receive pursuant to a collective bargaining agreement that was subsequently deferred or otherwise modified as a result of a negotiated amendment of that agreement shall be considered compensation earnable and shall not be deemed to have been paid to enhance a member's retirement benefit."  (§ 31542, subd. (c).)  None of the parties discusses application of this provision.

With respect to section 31461, the only difference between AB 340 and AB 197—both of which were enacted by the Legislature on August 31, 2012, and then signed together by the Governor on September 12, 2012—is that AB 197 also added subdivision (c) to codify the caveat noted by the Senate Rules Committee:  "The terms of subdivision (b) are intended to be consistent with and not in conflict with the holdings in Salus v. San Diego County Employees Retirement Association (2004) 117 Cal.App.4th 734 and In re Retirement Cases (2003) 110 Cal.App.4th 426."  (Stats. 2012, ch. 297, § 2.)

Although there is no material difference between the versions of subdivision (b) in AB 340 and AB 197, in the interests of simplicity for this appeal, we will adopt the parties' practice of referring to both measures as AB 197, and that designation and the Pension Reform Act will be used interchangeably.

Marin County, which was already wrestling with its own pension difficulties, [7] was one of the first to act to implement the Pension Reform Act.  On December 18, 2012,

[6] According to the Senate Rules Committee discussion of this language in AB 197: "This section implies [*sic*:  applies] to current members in the 1937 Act County Retirement System who have not yet retired.  The intent of this section is to reign [*sic*: rein] in pension spiking by current members of the system to the extent allowable by court cases that have governed compensation earnable in that system since 2003.  These cases allow certain cash payments to be included in compensation for the purpose of determining a benefit, but only to the extent that the cash payments were limited to what the employee earned in a year.  [¶]  A concern has been raised that, as written, the conference report [on AB 340] would increase the ability of some current employees to spike their pensions rather than achieving the intended outcome of reduction [*sic*: reducing] spiking opportunities.  [¶]  . . . [¶]  This bill will be transmitted to the Governor with the request that it be signed after AB 340."  (Sen. Rules Com., Analysis of Assem. Bill No. 197 (2011–2012 Reg. Sess.) as amended Aug. 31, 2012, p. 2; see Assem. Com. on Public Employees, Retirement and Social Security, Analysis of AB No. 340 (2011–2012 Reg. Sess.) as amended April 25, 2011, p. 4, quoted in fn. 3, *ante*.)

The Pension Reform Act included a similar provision concerning the "pensionable compensation" of members in the Public Employees' Retirement System (PERS).  (Stats. 2012, ch. 296, § 15, adding § 7522.34.)  Later in the 2012 session the Legislature adopted a comparable provision for the "creditable compensation" of teachers.  (Stats. 2012, ch. 864, § 1, amending Ed. Code, § 22119.2.)  As is the case with section 31461, both of these measures vested the boards administering the respective retirement systems with the authority to exclude "Any other form of compensation" (§ 7522.34, subds. (c)(11) & (c)(12)) and "Any other payments" (Ed. Code, § 22119.2, subd. (c)(9)) from pension calculations.  Section 7522.34 is especially noteworthy because, like subdivision (b)(1) of section 31461, it expressly excluded "Any compensation determined by the board to have been paid to increase a member's retirement benefit . . . ."  (§ 7522.34, subd. (c)(1).)

[7] As far back as 2005, calling for concerted and comprehensive action, the Marin County Civil Grand Jury had warned:  "Marin County . . . and its cities and towns . . . provide pension plans to their employees that are many times more generous than similar plans found in the private sector.  The volatility of the cost of these pensions has caused extreme stress on the budgets of many of these entities."  (Marin County Civil Grand Jury, The Bloated Retirement Plans of Marin County, Its Cities and Towns (May 9, 2005) p. 1.)

Six years later, the grand jury reported that the chickens were coming home to roost, and were in part responsible for current financial difficulties:  "During the financial fiasco of 2008 and 2009, the Marin County Employees' Retirement Association's (MCERA) net assets . . . declined by . . . 25.5% . . . due to investment losses.  Employer

the Board of Directors of the Marin County Employees' Retirement Association and its directors (collectively MCERA[8]) adopted a "Policy Regarding Compensation Earnable

pension costs have increased dramatically . . . ." [¶] "Although it is tempting to suggest that the cause of the budget problem is high total employee compensation, that is not the acute problem. . . . [T]he acute problem is unpredictable, rapid variation in compensation—caused at this time by increasing pension costs." (Marin County Civil Grand Jury, Public Sector Pensions: A Perspective (May 31, 2011) p. 1.)

The grand jury noted the county's Long-Term Restructuring Plan: "At current levels, public pension systems are not financially sustainable without reform. . . . Under current actuarial assumptions, it is projected that the County of Marin will experience an approximately 40% increase in employer pension contribution rates in FY 2010-11 . . . . This represents an increased General Fund cost of approximately $11.4 million next fiscal year, the most significant component of the County's estimated $15 million structural gap for FY 2010-11. Employer costs will continue to rise in subsequent years barring a significant rebound in investment earnings." (*Id*. at p. 7.) The grand jury also noted the county's "Annual Financial Report," which had concluded that employee compensation and pension costs were likely to endure beyond stock market fluctuations: " 'Public pensions are . . . a significant factor contributing to the projected budget shortfall. . . . Even with recent stock market gains, pension contributions are expected to increase in the next several years as asset gains and losses are typically smoothed to control rate volatility.' " (*Id*. at p. 6.) The grand jury concluded: "The pension plans of all MCERA's Sponsors [i.e., member organizations] are significantly underfunded, primarily due to investment losses. MCERA currently has reserves with a market value of only $1.21 billion . . . . The present value of benefits for members is $1.93 billion." (*Id*. at p. 18.)

In a 2015 report, the grand jury noted that the granting of largely unpublicized "pension enhancements . . . contributed to the increase of the unfunded pension liability of MCERA; this unfunded liability increased from a surplus of $26.5 million in 2000 to a deficit of $536.8 million in 2013. This increase may expose the citizens of Marin County to additional tax burdens to cover the unfunded costs and may place the future financial viability of the pension plans at significant risk. Additionally, such an impact may impair the governments' ability to provide the broad range of essential services that citizens are expecting; instead those funds may be used to pay for employee pensions." (Marin County Civil Grand Jury, Pension Enhancements: A Case of Government Code Violations and a Lack of Transparency (2015) p. 2.) The report closed with an ominous warning: "Action on this issue should not be delayed, as the effects of . . . improperly enhanced pensions grow each year" and "are increasing the payroll" of the governmental entities involved. (*Id*. at p. 7.)

[8] Formed in 1950 by Marin voters, MCERA is an independent governmental entity separate and distinct from the County of Marin. MCERA is described in the petition as

and Pensionable Compensation Determinations" implementing AB 197 with "the new rules set forth herein regarding the definition of Compensation Earnable," that would comply with the "new . . . section 31461." Commencing on January 1, 2013, specified items would be excluded from the new definition.[9]

---

"funded by actuarially calculated contributions from its members and their employers, and it calculates and then distributes pension benefits to its members once they retire." The grand jury's 2011 report stated: "Despite its economic importance and its impact on public budgets with resultant loss of jobs and reduction in services, the public seems to have little interest in what MCERA does . . . . MCERA's Board of Retirement and staff labor, for the most part, in obscurity." (Marin County Civil Grand Jury, Public Sector Pensions: A Perspective, *supra*, at p. 17.)

[9] The pertinent language of the revised policy reads:

"As a result of new subdivision (b)(3) of section 31461, which requires that, on and after January 1, 2013, all payments for 'additional services rendered outside of normal working hours, whether paid in a lump sum or otherwise' be excluded from compensation earnable, effective on and after that date, MCERA will no longer collect retirement contributions on, and will exclude from retirement calculation, standby-pay, administrative response pay, any form of call-back even if not paid at overtime rates.

"As a result of new subdivision (b)(1)(A) of section 31461, which permits in-kind conversions in the final compensation period to be excluded from final compensation, on and after January 1, 2013, effective on and after that date, MCERA will no longer collect retirement contributions on, and will exclude from retirement calculations, in-kind benefits converted to cash, such as waiver for health insurance cash back and 125 plan revision." (Underscore omitted.)

An attachment to the policy specified the "general pay items that are . . . excluded from . . . Compensation Earnable by MCERA effective on and after January 1, 2013": "In-kind benefits Converted to Cash (e.g., Waiver for Health Insurance Cash Back, 125 Plan Revision [see fn. 11 and accompanying text, *post*]);" "Payments for Additional Services Rendered Outside of Normal Working Hours (e.g., Standby, Administrative Response, and Call Back, whether overtime or not)"; "Reimbursements (e.g., Tool, Meal, Boot, Cell Phone, License)," "Overtime, Unless FLSA Premium Pay"; "Severance Payments"; "Leave Cash Outs Paid Only at Termination (e.g., Annual, Sick, Floating Holiday, Personal, Comp Time)," "Lump Sum Payment of Comp Time At Promotion"; "Payments (Not Remuneration for Service or Skills) paid in a Lump Sum or Other Form"; "Executive Bonuses"; "Employer Contributions to Deferred Compensation or Defined Contribution Plans."

MCERA's Board also specified the scope of its action: "[T]he new rules set forth herein regarding the definition of Compensation Earnable shall apply only to MCERA

## The Lawsuit

Reaction to the change in policy was almost immediate. On January 18, 2013, less than three weeks after the Pension Reform Act took effect, five recognized employee organizations and four individuals (collectively plaintiffs) commenced this action against MCERA.[10] Plaintiffs alleged that on December 18, 2012: "[T]he MCERA BOARD voted to implement AB 197 effective January 1, 2013 and announced a new policy for the calculation of retirement benefits. Under the policy, MCERA would begin excluding standby pay, administrative response pay, callback pay, cash payments for waiving health insurance, and other pay items from the calculation of members' final compensation for all compensation earned after January 1."

Plaintiffs further alleged:

"Since at least 1997, . . . if not before then, MCERA, the County, and other MCERA-participating employers agreed to include certain elements of compensation, in

members who retire from MCERA on and after January 1, 2013, and only then as to the portion of their final average compensation periods that occur on or after the effective date of the new statutory exclusions, January 1, 2013."

[10] The plaintiff organizations were the Marin Association of Public Employees, Local 1021 of the Service Employees International Union, Local 856 of the International Brotherhood of Teamsters, the Marin County Fire Department Firefighters' Association, and the Marin County Management Employees Association, which collectively represent approximately 2100 county employees who are members of MCERA. The four individuals named as plaintiffs previously received a specified type of benefit terminated by AB 197, to wit: "an eligibility worker . . . for approximately 31 years" who "receives cash in lieu of fringe benefits that MCERA has previously included as compensation earnable for purposes of calculating her pension benefits"; "a deputy district attorney . . . for approximately 23 years" who "receives on-call pay that MCERA has previously included as compensation earnable for purposes of calculating his pension benefits"; "a fire captain . . . for approximately 27 years" who "receives so-called 'hold harmless' payments . . . which MCERA has previously included as compensation earnable for purposes of calculating his pension benefits"; and "a Program Manager . . . employed by the County . . . since 1977" and who also "receives so-called 'hold harmless' payments . . . which MCERA has previously included as compensation earnable for purposes of calculating his pension benefits." The Teamsters local and the deputy district attorney are not parties to this appeal.

addition to base pay, as compensation earnable for purposes of calculating retirees' final compensation, and thus, pension benefits. . . .

"Among other elements of compensation that have long been included in pension calculations are standby pay, administrative response pay, call-back pay, and cash payments made to employees who waive health insurance coverage. More recently, the County negotiated changes to its Internal Revenue Code Section 125 cafeteria plan[11]. . . resulting in payments in cash in lieu of fringe benefits, which the County and MCERA agreed would be treated as compensation earnable (so-called 'hold harmless' payments). . . .

"Over the years, MCERA and employers who participate in MCERA, such as the County, have repeatedly communicated and committed to MCERA members that these and other elements of compensation would be included in the calculation of members' final compensation and encouraged MCERA members to plan their retirement based on the idea that these pay items would be included in the determination of their pension benefits. MCERA and participating employers made these representations and commitments to members in MOUs, plan documents, newsletters, bulletins, handbooks, handouts, official policy statements, and other publications and correspondence with MCERA members. . . .

"Because MCERA has included these various pay items in the calculation of retirement benefits, the cost of these benefits has been actuarially factored into contribution rates and has been paid for by both member and employer contributions. Additionally, the value and associated costs of these benefits have also been a factor in determining the wage and benefit packages offered to MCERA members through

---

[11] 26 U.S.C. section 125(d)(1) provides: "The term 'cafeteria plan' means a written plan under which— [¶] (A) all participants are employees, and [¶] (B) the participants may choose among 2 or more benefits consisting of cash and qualified benefits." "The term 'qualified benefit' means any benefit which . . . is not includible in the gross income of the employee . . . ." (*Id*., subd. (f)(1).)

collective bargaining . . . and in some instances has led to employees accepting lower wages or other benefits."

Plaintiffs also complained about the generalized way in which MCERA had changed its policy: "In addition to impairing MCERA members' vested rights," MCERA "also decided to exclude certain pay items from compensation earnable without making a determination that such compensation has been paid to enhance MCERA members' retirement benefits, as required by AB 197. To the extent any determination has been made that these pay items have been paid to enhance retirement benefits, such determinations are incorrect and constitute an abuse of discretion."

Plaintiffs further alleged that they "relied on MCERA and participating employers' commitment to include these pay items in the calculation of final compensation, and they agreed to accept employment and remain employees of their respective employers based on the promised pension benefit"; and that "[t]he elimination of these various pay items from the calculation of MCERA members' final compensation will result in a reduction in members' pension benefits below what they had previously been promised," and "the value of the benefits . . . are a form of deferred compensation for work already performed," and "protected by Article I, section 9 of the California Constitution and Article I, section 10, clause 1 of the United States Constitution."[12] And plaintiffs concluded: "By excluding items from the final compensation calculation that

---

[12] Because the issue comes to us following the sustaining of a general demurrer, "we accept, and liberally construe, the truth of the complaint's properly pleaded factual allegations, but not contentions, deductions, or conclusions of fact or law." (*Caldera Pharmaceuticals, Inc. v. Regents of University of California* (2012) 205 Cal.App.4th 338, 350.) There is no genuine disagreement between plaintiffs and MCERA concerning historical events. Only the causally connected allegations of representations and reliance might be problematic. However, because they center around how plaintiffs responded to representations made by MCERA—representations MCERA has never denied making—we accept them as proper allegations of ultimate fact, not law. (See, e.g., *Estate of Bixler* (1924) 194 Cal. 585, 589–590; *Winn v. McCulloch* (1976) 60 Cal.App.3d 663, 670; 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 730, p. 148.) These allegations relate to the common law estoppel cause of action plaintiffs claim they should have been allowed to plead, a claim we reject. (See fn. 24, *post*.)

13

MCERA had previously committed to provide, AB 197 unconstitutionally impairs MCERA members' vested rights."

Plaintiffs prayed for declaratory and injunctive relief that AB 197 and MCERA's "actions are unconstitutional impairments of vested rights and therefore unenforceable." Plaintiffs also prayed for issuance of a writ of mandate "to compel [MCERA] to continue to calculate the pensions of its members in a manner consistent with its policies in effect before December 18, 2012 and in a manner consistent with binding promises made to MCERA members."

The State of California was granted leave to intervene, as expressly directed by the governor, in order that it could defend the constitutionality of AB 197. Shortly thereafter, MCERA interposed a general demurrer on the sole ground that, because "AB 197 . . . [is] constitutional," and MCERA was "required by law to implement . . . AB 197," plaintiffs had failed to state a cause of action. Plaintiffs filed opposition vigorously disputing both of these points.

In June 2013, after hearing extensive argument, the trial court sustained MCERA's demurrer without leave to amend and entered judgment against plaintiffs.

## DISCUSSION

The crux of this appeal is whether MCERA may eliminate benefits previously treated as compensation earnable from the calculation of the pension formula for what plaintiffs term "legacy members"—employees who were hired prior to January 1, 2013—because AB 197 modified that formula. In legal terms, did the narrowing achieved by AB 197 impair plaintiffs' vested pension rights? Because there is no genuine factual dispute presented (see fn. 12, *ante*), the issue is purely one of law for our independent review. (*Teachers' Retirement Bd. v. Genest* (2007) 154 Cal.App.4th 1012, 1028 and decisions cited.)

However, before we consider the constitutional issue, we are obligated to ascertain if the appeal may be decided on some other, nonconstitutional ground. (E.g., *Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 66; *Teachers' Retirement Bd. v. Genest, supra,* 154 Cal.App.4th 1012, 1043.) Plaintiffs advance two such claims.

14

**The Order Sustaining MCERA's Demurrer Is**
**Not Procedurally Defective**

Plaintiffs first attack the trial court's order as procedurally defective because it "does not provide a justification for sustaining the demurrer." If the attack were to succeed, the judgment can be reversed on a nonconstitutional basis. But the attack will not succeed.

In its entirety, the trial court's order read: "Respondents' Demurrer to the Verified Writ Petition is sustained without leave to amend. The court finds the Respondents' actions implementing Govt. Code § 31461, as amended effective January 1, 2013, are proper and that the Public Employees' Pension Reform Act of 2013 is constitutional. The Respondent Board of Retirement has the exclusive authority and responsibility to determine its members 'compensation earnable,' which is used to calculate members' retirement allowance, pursuant to Govt. Code § 31461. (See *Howard Jarvis Taxpayers' Ass'n. v. Bd. of Supervisors of Los Angeles County* (1996) 41 Cal.App.4th 1363, 1373, and *In re Retirement Cases* (2003) 110 Cal.App.4th 426, 453.) A statute, once duly enacted, is presumed to be constitutional. [¶] SO ORDERED."

This order was filed on June 19, 2013, and mailed to the parties the following day. On June 24, MCERA mailed plaintiffs notice of entry. The ensuing judgment, which quoted almost all of the order, was entered on June 26, the same day plaintiffs unsuccessfully moved for reconsideration of the order, following which they were rebuffed in their request for extraordinary relief from this court. (*Marin Association of Public Employees v. Superior Court* (Feb. 25, 2014, A139621) [nonpub. opn].) At no time during these proceedings did plaintiffs advise the trial court, or attack the order, on the ground now advanced. By reason of this inaction, the claim was forfeited. (E.g., Code Civ. Proc., § 472d, quoted at fn. 13, *post*; *E. L. White, Inc. v. City of Huntington Beach* (1978) 21 Cal.3d 497, 504, fn. 2; *Lambert v. Carneghi* (2008) 158 Cal.App.4th 1120, 1128, fn. 4.)

15

Even if the claim had been preserved for review, it would not require reversal. California has a statute governing this precise subject, one not cited in plaintiffs' briefs.[13] Concerning that statute, this court long ago recognized that it "has been interpreted to require the affirmance of trial court rulings on demurrers if any of the grounds raised by defendant require the sustaining of the demurrer, whether or not the court specifies all the grounds." (*Banerian v. O'Malley* (1974) 42 Cal.App.3d 604, 610.) That is why the ruling is examined de novo on the sole legal question of whether the complaint states a claim for relief upon any theory. (E.g., Code Civ. Proc., § 589; *McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415; cf. *Wells v. Marina Properties, Inc.* (1981) 29 Cal.3d 781, 787 [" 'a demurrer of course calls for the determination of an issue of law only.' "].)

So it is incorrect to treat the ruling on a demurrer as akin to a statement of decision, which is only required, upon request, "upon the trial of a question of fact." (Code Civ. Proc., § 632.) But this is clearly what plaintiffs believe is missing from the trial court's order. Instead of "rationaliz[ations]," "general proposition[s]," and "platitude[s]," plaintiffs appear to think the trial court should have provided a point-by-point analysis of each of the legal issues raised by the petition. That belief is patently unreasonable and far exceeds the statutory requirement.[14] (See *Mautner v.*

---

[13] "Whenever a demurrer in any action or proceeding is sustained, the court shall include in its decision or order a statement of the specific ground or grounds upon which the decision or order is based which may be by reference to appropriate pages and paragraphs of the demurrer. [¶] The party against whom a demurrer has been sustained may waive these requirements." (Code Civ. Proc., § 472d.)

[14] That unreasonability is best shown by the consequences of an issue to which the parties devote considerable attention in the briefs, namely, whether the items MCERA would discontinue treating as compensation earnable as of January 1, 2013, qualified as compensation earnable under the version of section 31461 as construed in *Ventura County Deputy Sheriffs' Assn. v. Board of Retirement* (1997) 16 Cal.4th 483, 487 (*Ventura County*) [under CERL "items of 'compensation' paid in cash . . . must be included in the 'compensation earnable' . . . on which an employee's pension is based"], prior to enactment of the Pension Reform Act. Plaintiffs would appear to expect the trial court to have analyzed each of the dozens of specific items and payments that MCERA

16

*Peralta* (1989) 215 Cal.App.3d 796, 802 ["Code of Civil Procedure section 472d does not mandate a detailed statement explaining the court's reasons for sustaining the demurrer"]; *Berkeley Police Assn. v. City of Berkeley* (1977) 76 Cal.App.3d 931, 943 [trial court is not required to set "forth a memorandum of decision stating in detail its reasons for sustaining the demurrer"].)  The decisive issue, as even MCERA and the state concede, is whether MCERA's implementation of AB 197 constitutes an unconstitutional impairment of plaintiffs' contracts of employment and concomitant pension benefits.  MCERA's general demurrer required the trial court to decide that issue as a matter of law with a yes or a no answer, which would resolve the sole ground for MCERA's demurrer: did plaintiffs fail to state a cause of action?  The trial court made that decision, with its reasons given.  Plaintiffs may not like the brevity of those reasons, but Code of Civil Procedure section 472d requires no more for our de novo review.  (*E. L. White, Inc. v. City of Huntington Beach*, *supra*, 21 Cal.3d 497, 504, fn. 2; *Berkeley Police Assn. v. City of Berkeley*, *supra*, at p. 943.)

### The Manner in Which MCERA Implemented AB 197 Was Not Improper

The second nonconstitutional ground for reversal advanced by plaintiffs is that MCERA "did not follow the correct procedural requirements" of AB 197 "for excluding payments made to 'enhance a member's retirement benefit.' "  Again, plaintiffs are not correct.

The Pension Reform Act added section 31542, the pertinent provisions of which provide:

"(a)  The board shall establish a procedure for assessing and determining whether an element of compensation was paid to enhance a member's retirement benefit.  If the

---

would no longer treat as compensation earnable (see fn. 9, *ante*) and determined whether each qualified as compensation earnable according to *Ventura County*.  The pointlessness of such a time consuming exercise is that it takes no account of the *Ventura County* approach being altered by the Pension Reform Act's amending the definition of compensation earnable in section 31461, and only begs the core issue of the Legislature's power to make that change.  (See fn. 22, *post*.)

17

board determines that compensation was paid to enhance a member's benefit, the member or the employer may present evidence that the compensation was not paid for that purpose. Upon receipt of sufficient evidence to the contrary, a board may reverse its determination that compensation was paid to enhance a member's retirement benefits.

"(b) Upon a final determination by the board that compensation was paid to enhance a member's retirement benefit, the board shall provide notice of that determination to the member and employer. The member or employer may obtain judicial review of the board's action by filing a petition for writ of mandate within 30 days of the mailing of that notice."

Plaintiffs correctly recognize that these provisions are intended to govern individualized determinations. As plaintiffs describe it: "[T]he focus is on whether compensation was made to enhance a particular member's retirement—hence the instruction that the procedure determine whether '*a* member's retirement benefit' has been enhanced. [¶] [I]f the board makes such a determination, the member or the member's employer must be given an opportunity to present evidence to the contrary. This presumes, of course, that the employee and employer must be given some kind of notice of the determination, since otherwise the right to present contrary evidence would be meaningless. The retirement board then has an opportunity to reverse its decision, if the employee or employer presents 'sufficient evidence to the contrary.' [¶] Finally, if the retirement board persists in holding that the compensation was paid to enhance the member's retirement benefit, either the individual member or the member's employer may thereafter seek review of the board's decision by filing a petition for writ of mandate. Again, this is an individualized right and requires an analysis specific to the particular member." But here, plaintiffs conclude, "Marin CERA did not make a determination that payments for in-kind benefits converted to cash were made in order to enhance any particular member's retirement benefit." This analysis of section 31542 is perfectly reasonable, but plaintiffs misapprehend its application here, particularly as the situation is defined by the allegations of plaintiffs' petition.

18

Section 31542 is clearly intended to serve as the mechanism for calculating the pension of an employee about to retire. There is nothing to indicate the statute was intended to govern the situation here—a shift in policy by the retirement board in compliance with a new command from the Legislature, clearly intended to be applied in the future to plaintiffs' so-called employees when they put in for retirement. Indeed, if plaintiffs' construction were correct, section 31542 would initiate the calculation process for every employee affected by the change, without regard to whether actual retirement is imminent for him or her. This would entail a massive expenditure of administrative resources devoted to an individualized inquiry that would be pointless for all employees not on the cusp of retirement. We have repeatedly emphasized that statutory language is to be construed to avoid such absurd or outlandish consequences. (See *Pacific Gas & Electric Co. v. Public Utilities Com.* (2015) 237 Cal.App.4th 812, 857 and decisions cited.) We conclude that MCERA has not, in plaintiffs' words, "failed to follow the required procedure for excluding payments" from the determination of each employee's "compensation earnable."

**The Amendment to Section 31461 Is Not an
Unconstitutional Impairment of Plaintiffs' Vested Pension Rights**

Plaintiffs' essential position is clearly set out in their opening brief: "[P]ublic employees earn a vested right to their pension benefits immediately upon acceptance of employment and . . . such benefits cannot be reduced without a comparable advantage being provided." "A corollary of this approach is that public employees are also entitled to any increase in benefits conferred during their employment, beyond the pension benefit in place when they began. [S]ince they are performing work under the improved pension system, the terms of that system become an integral part of their compensation, and they immediately become vested in the improved benefit." "Because A.B. 197 has resulted only in the exclusion of payments from pension benefits, with no new benefit to offset the decreased pensions, this infringes employees' vested rights."

Plaintiffs candidly admit "[i]n practice, this means that for existing employees, any changes must generally be neutral with regard to the overall benefit provided and

19

cannot represent a net decrease in the pension benefit."[15]  Less ambiguously, they assert "neither Marin CERA nor the Legislature can now curtail those benefits."  Plaintiffs insist that if their position is not vindicated on this appeal, California will have returned to "the view that public employee pensions are mere 'gratuities' to be granted or taken away at the whim of the employer."

A brief review of principles governing public employee pensions will show that much of plaintiffs' reasoning is not controversial, but their ultimate conclusion cannot be sustained.

*Some General Law of Pensions*

States are prohibited by the United States Constitution from passing a law "impairing the obligation of contracts."  (U.S. Const., art. I, § 10.)  Article I, section 9 of the California Constitution states a parallel proscription:  "A . . . law impairing the obligation of contracts may not be passed."

" '[P]ublic employment gives rise to certain obligations which are protected by the contract clause of the Constitution, including the right to the payment of salary which has been earned.' "  (*Miller v. State of California* (1977) 18 Cal.3d 808, 815 (*Miller*).)  "Earned" in this context obviously means in exchange for services already performed.  (See *White v. Davis* (2003) 30 Cal.4th 528, 566.)  Ordinarily, "[p]romised compensation is one such protected right."  (*Olson v. Cory* (1980) 27 Cal.3d 532, 538.)

In accordance with this view, a pension is treated as a form of deferred salary that the employee earns prior to it being paid following retirement.[16]  In *Miller*'s classic

---

[15] It bears emphasis that we construe plaintiffs' language concerning "a net decrease in the pension benefit" as referring to a reduction of the *anticipated* "pension benefit" of still working employees.  Plaintiffs' limitation of this action to legacy employees clearly excludes any question of decreasing the pensions to retired employees, and nothing in this opinion addresses the power of either state or local employers to do so.  (See fn. 19, *post*.)

[16] Which means it can never be the mere gratuity hyperbolically feared by plaintiffs.  (See *Riggs v. District Retirement Board* (1942) 21 Cal.2d 382, 385 [" ' "A pension is a gratuity *only* where it is granted for services previously rendered which at the time they were rendered gave rise to no legal obligation . . .  But where, as here, services

20

formulation: " 'It is true that an employee does not earn the right to a full pension until he has completed the prescribed period of service, but he has actually earned some pension rights as soon as he has performed substantial services for his employer.[17] [Citations.] He is not fully compensated upon receiving his salary payments because, in addition, he has then earned certain pension benefits, the payment of which is to be made at a future date. While payment of these benefits is deferred, and is subject to the condition that the employee continue to serve for the period required by the statute, the mere fact that performance is in whole or in part dependent upon certain contingencies does not prevent a contract from arising, and the employing governmental body may not deny or impair the contingent liability any more than it can refuse to make the salary payments which are immediately due.'

" 'Although vested prior to the time when the obligation to pay matures, pension rights are not immutable. For example, the government entity providing the pension may make reasonable modifications and changes in the pension system. This flexibility is necessary 'to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system and carry out its beneficent policy.' " (*Miller*, *supra*, 18 Cal.3d 808, 815–816, quoting *Kern v. City of Long Beach*, *supra*, 29 Cal.2d 848, 854–855.)

*Miller* continued in its restatement of pension principles: "In *Wallace* [*v. City of Fresno* (1954) 42 Cal.2d 180, 183], referring to *Kern*, we again emphasized 'that a public

---

are rendered under a pension statute, the pension provisions become a part of the contemplated compensation for those services and so in a sense a part of the contract of employment itself." ' "].)

[17] Thus it is commonly said that a public employee has pension rights that "vest" on the first day of employment (e.g., *Kern v. City of Long Beach* (1947) 29 Cal.2d 848, 852, 855 and decisions cited), or in the less precise phrasing used by plaintiffs, "upon acceptance of employment." (*Betts v. Board of Administration* (1978) 21 Cal.3d 859, 863.) We say less precise because, unlike professional sports, there are no signing bonuses in public service. The actual moment of vesting comes with the commencement of work, which gives rise to "the right to the payment of salary *which has been earned*." (*Miller*, *supra*, 18 Cal.3d 808, 813, italics added.)

pension system is subject to the implied qualification that the governing body may make reasonable modifications and changes before the pension becomes payable and that until that time the employee does not have a right to any fixed or definite benefits but only to a substantial or reasonable pension.' " (*Miller*, *supra*, 18 Cal.3d 808, 816; see *Betts v. Board of Administration*, *supra*, 21 Cal.3d 859, 863 ["The employee does not obtain, prior to retirement, any absolute right to fixed or specific benefits, but only to a 'substantial or reasonable pension.' "]; *Packer v. Board of Retirement* (1950) 35 Cal.2d 212, 218 ["any one or more of the various benefits offered . . . may be wholly eliminated prior to the time they become payable, provided . . . the employee retains the right to a substantial pension"]; cf. *Terry v. City of Berkeley* (1953) 41 Cal.2d 698, 702 [citing *Packer* as "authority for the proposition that reasonable changes detrimental to [public employees] may be made" prior to retirement].)

What the Supreme Court stated in *Kern* deserves more than the excerpt quoted in *Miller*: "The rule permitting modification of pensions is a necessary one since pension systems must be kept flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system and carry out its beneficent policy. . . . [¶] Thus it appears . . . that an employee may acquire a vested contractual right to a pension but that this right is not rigidly fixed by the specific terms of the legislation in effect during any particular period in which he serves. The statutory language is subject to the implied qualification that the governing body may make modifications and changes in the system. The employee does not have a right to any fixed or definite benefits, but only to a substantial or reasonable pension. There is no inconsistency therefore in holding that he has a vested right to a pension but that the amount, terms and conditions of the benefits may be altered."[18] (*Kern v. City of Long Beach*, *supra*, 29 Cal.2d 848, 854–855.)

---

[18] Immediately before this excerpt, the court cited *Casserly v. City of Oakland* (1936) 6 Cal.2d 64 as one of the authorities for the proposition that "[i]t has also been held that a pension could be reduced prior to retirement from two-thirds to one-half of the

Our Supreme Court has repeatedly stated that while pension rights may not be "destroyed," they may be modified prior to the employee's retirement. (E.g., *International Assn. of Firefighters v. City of San Diego* (1983) 34 Cal.3d 292, 300–301; *Allen v. Board of Administration* (1983) 34 Cal.3d 114, 120; *Miller*, *supra*, 18 Cal.3d 808, 815; *Kern v. City of Long Beach*, *supra*, 29 Cal.2d 848, 853–855.) The right to modify inheres in the inalienable rights of government.

*There Is No Absolute Requirement That Elimination or*
*Reduction of an Anticipated Retirement Benefit "Must"*
*Be Counterbalanced by a "Comparable New Benefit"*

In one of the decisions cited in *Miller*, the Supreme Court stated: "To be sustained as reasonable, alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages." (*Allen v. City of Long Beach* (1955) 45 Cal.2d 128, 131.) It is a onetime variation of this last sentence that is a foundation of plaintiffs' appeal on the constitutional issue.

In 1983, our Supreme Court stated: "A constitutional bar against the destruction of such vested contractual pension rights, however, does not absolutely prohibit their

employee's salary, and modifications have been approved in some cases when made after the happening of the contingencies upon which the payments were to commence." (*Kern v. City of Long Beach, supra,* 29 Cal.2d 848, 854.) *Casserly* involved a Depression-era ordinance that by reducing the pay of serving employees achieved a corresponding reduction of pension payments to retirees who had held the same pay grade. In the course of upholding the reduction, the Supreme Court quoted with approval the decision of this court in *Aitken v. Roche* (1920) 48 Cal.App. 753, 755, where we characterized as "fallacious" the argument that "the amount of a prospective pension is fixed" in perpetuity. (*Casserly v. City of Oakland*, *supra*, at p. 68.) This is especially true with so-called "fluctuating" pension systems where retirement benefits are pegged to current salaries. (See, e.g., *Eichelberger v. City of Berkeley* (1956) 46 Cal.2d 182, 185 ["It is settled that where the pension statute states . . . that the pension shall be a percentage of the average salary attached to the rank held by the employee before retirement, it is construed as providing for a fluctuating pension which increases or decreases as the salaries paid to active employees increase or decrease," citing *Casserly* and *Aitken*].)

modification. With respect to *active* employees, we have held that any modification of vested pension rights must be reasonable, must bear a material relation to the theory and successful operation of a pension system, and, when resulting in disadvantage to employees, *must* be accompanied by comparable new advantages. [Citations.]"[19] (*Allen v. Board of Administration*, *supra*, 34 Cal.3d 114, 120, italics added.) The single word we have italicized, and the thought it seemingly expresses, permeates plaintiffs' opening brief. However, we do not believe the word "must" was intended to be given the literal and inflexible meaning attributed to it by plaintiffs.

The Supreme Court in the 1983 *Allen* opinion cited three decisions as support for the quoted proposition. The two Supreme Court decisions cited employed the word "should." (*Allen v. City of Long Beach*, *supra*, 45 Cal.2d 128, 131 ["To be sustained as reasonable, alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages"]; *Abbott v. City of Los Angeles*, *supra* 50 Cal.2d 438, 449 [quoting this

---

[19] The likelihood of a change amounting to an impermissible impairment is greater when the change applies to retired employees. Retirees receive an extra measure of judicial solicitude because their part of the contract has already been fully performed. (See *Allen v. Board of Administration*, *supra*, 34 Cal.3d 114, 120 ["As to retired employees, the scope of continuing governmental power may be more restricted, the retiree being entitled to the fulfillment . . . of the contract which he has already performed"]; *Abbott v. City of Los Angeles*, *supra*, 50 Cal.2d 438, 455 [municipality must meet "its contractual obligations, the consideration for which has already been received by it"]; *Terry v. City of Berkeley*, *supra*, 41 Cal.2d 698, 702–703 [principle that "the right to a pension is a vested right . . . is a right to fair pension . . . the terms of which may be altered within reason without an impairment of the contract" not applicable to retirees; "the plaintiff had been retired; he had rendered the called-for performance; he had done everything possible to entitle him to the payment of his pension"].) The patent unfairness of diminishing the benefits a pensioner earned prior to ceasing employment needs no belaboring. That possibility is not presented here, as the only issue is the application of AB 197 to persons still working. (See fn. 15, *ante*.) For that reason, decisions upon which plaintiffs rely such as *Protect Our Benefits v. City and County of San Francisco* (2015) 235 Cal.App.4th 619 and *United Firefighters of Los Angeles City v. City of Los Angeles* (1989) 210 Cal.App.3d 1095, are inapposite.

24

sentence from *Allen*].)  It is only a 1969 Court of Appeal decision, which cites the same two Supreme Court decisions, that uses "must."  (*Lyon v. Flournoy* (1969) 271 Cal.App.2d 774, 782 (*Flournoy*) ["In brief, modifications affecting the earned pension rights of active employees must be reasonable, related to the theory of a sound pension system, and changes detrimental to the individual must be offset by comparable new advantages.  (*Abbott v. City of Los Angeles*, *supra*, 50 Cal.2d at pp. 447, 449; *Allen v. City of Long Beach*, *supra*, 45 Cal.2d at pp. 131-133.)"].)

There is, of course, no bar to the Supreme Court adopting a Court of Appeal's reasoning as its own.  Yet there is legitimate reason to question whether that was what the Supreme Court intended in 1983.  First, as just shown, only the least authoritative of the three sources cited actually supports the word "must," while the two Supreme Court decisions employ "should."  Second, barely a month later, the Supreme Court—speaking though the same justice—filed another decision which used the "should" formulation from the 1955 *Allen* decision as quoted in *Abbott*.[20]  Third, the 1983 *Allen* decision involved retirees (and *Flournoy* the widow of a retiree), who historically receive a heightened degree of judicial protection.  (See fn. 19, *ante*.)  Fourth, and most significantly, the "must" formulation has never been reiterated by the Supreme Court, which has instead uniformly employed the "should" language from the 1955 *Allen* decision.  (*Olson v. Cory*, *supra*, 27 Cal.3d 532, 541 ["Although an employee does not obtain any 'absolute right to fixed or specific benefits . . . there [are] strict limitation[s]

---

[20] "Of course, we have repeatedly observed that even such 'vested contractual pension rights may be modified prior to retirement for the purpose of keeping a pension system flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system.  [Citations] . . . .'  (*Allen v. City of Long Beach*, *supra*, 45 Cal.2d at p. 131.)  Nonetheless, '[s]uch modifications must be reasonable,' and to be sustained as such, 'alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages. [Citations.]'  (*Ibid*.) . . . .  (*Abbott v. City of Los Angeles* (1958) 50 Cal.2d 438, 449.)"  (*International Assn. of Firefighters v. City of San Diego*, *supra*, 34 Cal.3d 292, 300–301.)

on the conditions which may modify the pension system in effect during employment.' [Citation.] Such modifications must be reasonable and any ' "changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages" ' "]; *Legislature v. Eu* (1991) 54 Cal.3d 492, 529–530 [quoting *Olson*]; *City of Huntington Beach v. Board of Administration* (1992) 4 Cal.4th 462, 472 ["changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages," citing *Allen v. City of Long Beach*, *supra*, 45 Cal.2d 128, 131].)

It thus appears unlikely that the Supreme Court's use of "must" in the 1983 *Allen* decision was intended to herald a fundamental doctrinal shift. "Should," not "must," remains the court's preferred expression. And "should" does not convey imperative obligation, no more compulsion than "ought." (*Lashley v. Koerber* (1945) 26 Cal.2d 83, 90; see *People v. Webb* (1986) 186 Cal.App.3d 401, 409, fn. 2 ["the word 'should' is advisory only and not mandatory"].) In plain effect, "should" is "a recommendation, not . . . a mandate." (*Cuevas v. Superior Court* (1976) 58 Cal.App.3d 406, 409.)

But the most persuasive evidence against the Supreme Court intending to impose a quid pro quo standard is circumstantial—the bottom line of who won. The issue in *Allen* was whether pension payments to retired legislators could be reduced pursuant to new statutory and constitutional language. The trial court had concluded that reduction would be contrary to the contract clauses of both state and federal constitutions. (*Allen v. Board of Administration*, *supra*, 34 Cal.3d 114, 118–119.) The Supreme Court reversed, holding that the reduction was not constitutionally improper. There is nothing in the opinion linking the reduction to provision of some new compensating benefit. If the court intended "must" to have a literal meaning, the retirees would have won. They lost.

In light of the foregoing, we cannot conclude that *Allen v. Board of Administration* in 1983 was meant to introduce an inflexible hardening of the traditional formula for public employee pension modification. Consequently, we do not deem ourselves bound by expressions in Court of Appeal opinions—including our own in *In re Retirement Cases*, *supra*, 110 Cal.App.4th 426, 448—reiterating the *Allen* language.

26

In any event, we think there is a "new benefit" provided by the Pension Reform Act. That measure made no change to the definition of "compensation" in CERL, namely section 31460. The change in policy adopted by MCERA—which is not an employer of any individual plaintiff or of persons employed by other governmental entities—is not alleged to have changed in the way compensation is calculated by any of those entities. Thus, for all we know, employees who prior to MCERA changing its policy in December 2012 collected any of the items or payments at issue (see fn. 9, *ante*) continued to have those items or payments included in their monthly compensation. However, due to MCERA's change in policy, each of those employees' paychecks is no longer being reduced by deductions to cover those sums in funding the employee's retirement. Put simply, the new benefit is an increase in the employee's net monthly compensation. Put even more simply, it is more cash in hand every month.

### *Plaintiffs Do Not Establish that Their Vested Right to a Reasonable Pension Has Been Substantially Impaired*

Plaintiffs' initial premise, and the centerpiece of their oral argument, is that the moment each individual plaintiff commenced working for a public agency in Marin County, that person acceded to a "vested right" to a pension. To a large extent, that premise is correct. As already established by *Miller*, the "right" to a pension "vests" when the first portion of wages or salary already earned is deferred by being withheld for a future pension. (See fn. 17 and accompanying text, *ante*.) But to call a pension right "vested" is to state a truism. As one Court of Appeal sensibly noted, "ALL pension rights are vested" in the sense they cannot be destroyed. (*Santin v. Cranston* (1967) 250 Cal.App.2d 438, 443.) Until retirement, an employee's entitlement to a pension is subject to change short of actual destruction. That same Court of Appeal aptly—and accurately—characterized that entitlement as only "a limited vested right." (*Id*. at p. 441.) Even plaintiffs concede there is no talismanic significance to "vested rights" that will prevent legislative modification between hiring and retirement. However, what plaintiffs fail to acknowledge is that in the very authority on which their position is based, our Supreme Court explained just how potent is this governmental power.

27

"Not every change in a retirement law constitutes an impairment of the obligations of contracts, however. [Citation.] Nor does every impairment run afoul of the contract clause. The United States Supreme Court has observed, 'Although the Contract Clause appears literally to proscribe "any" impairment, . . . "the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula." [Citation.] Thus, a finding that there has been a technical impairment is merely a preliminary step in resolving the more difficult question whether that impairment is permitted under the Constitution.' [Citation.] An attempt must be made 'to reconcile the strictures of the Contract Clause with the "essential attributes of sovereign power," . . .' [Citation.] For example, '[m]inimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation.' [Citations.]

"The high court also has expressed the relevant principles another way: 'The constitutional prohibition against contract impairment does not exact a rigidly literal fulfillment; rather, it demands that contracts be enforced according to their "just and reasonable purport"; not only is the existing law read into contracts in order to fix their obligations, but the reservation of the essential attributes of continuing governmental power is also read into contracts as a postulate of the legal order. [Citations.] The contract clause and the principle of continuing governmental power are construed in harmony; although not permitting a construction which permits contract repudiation or destruction, the impairment provision does not prevent laws which restrict a party to the gains "reasonably to be expected from the contract." [Citation.] Constitutional decisions "have never given a law which imposes unforeseen advantages or burdens on a contracting party constitutional immunity against change." [Citations.]' [Citations.]" (*Allen v. Board of Administration*, *supra*, 34 Cal.3d 114, 119–120 [quoting *United States Trust Co. v. New Jersey* (1977) 431 U.S. 1 and *City of El Paso v. Simmons* (1965) 379 U.S. 497].)

To return to *Miller*: "The scope of permissible modifications of vested pension rights was established in *Allen v. City of Long Beach* (1955) 45 Cal.2d 128 . . . : 'Such

28

modifications must be reasonable, and it is for the courts to determine upon the facts of each case what constitutes a permissible change. To be sustained as reasonable, alterations of employees' pension rights must bear some material relation to the theory of a pension system and its successful operation, and changes in a pension plan which result in disadvantage to employees should be accompanied by comparable new advantages.' (*Allen, supra*, at p. 131.)" (*Miller*, *supra*, 18 Cal.3d 808, 816.)

Implicit in the formula, however expressed, is that alterations, changes, and modifications do not invariably work to the employee's benefit. In large measure, the judicial history of examining pensions is largely given over to broken promises and changed circumstances. Nevertheless, the basic limits are established.

When the Supreme Court says that vested pension rights may not be "destroyed," it means a pension system cannot be abolished on the eve of retirement (see *Kern v. City of Long Beach*, *supra*, 29 Cal.2d 848 [municipal pension plan repealed 32 days before employee completed 20-years service needed for retirement]); or not after substantial service has been provided (see *Legislature v. Eu*, *supra*, 54 Cal.3d 492 [initiative measure abolishing legislative pension system valid only as to persons subsequently elected]); or not by effectively abolishing a pension plan the legislative authority refuses to fund. (See *Bellus v. City of Eureka* (1968) 69 Cal.2d 336, 352; *Valdes v. Cory* (1983) 139 Cal.App.3d 773, 787; *Klench v. Board of Pension Fd. Commrs*. (1926) 79 Cal.App.171, 182.)

But there are acceptable changes aplenty that fall short of "destroying" an employee's anticipated pension. "Reasonable" modifications can encompass reductions in promised benefits. (E.g., *Miller*, *supra*, 18 Cal.3d 808 [change of retirement age with reduction of maximum possible pension]; *Claypool v. Wilson* (1992) 4 Cal.App.4th 646 [repeal of cost of living adjustments]; *Brooks v. Pension Board* (1938) 30 Cal.App.2d 118 [pension reduced prior to retirement from two-thirds to one-half of employee's salary].) Or changes in the number of years service required. (*Miller*, *supra*, at p. 818 ["Upon being required by law to retire at age 67 rather than age 70, plaintiff suffered no impairment of vested pension rights since he had no constitutionally protected right to

29

remain in employment until he had earned a larger pension at age 70"]; *Amundsen v. Public Employees' Retirement System* (1973) 30 Cal.App.3d 856 [change in minimum service requirement].) Or a reasonable increase in the employee's contributions. (§ 31454; *International Assn. of Firefighters v. City of San Diego*, *supra*, 34 Cal.3d 292, 300–301; *City of Downey v. Board of Administration* (1975) 47 Cal.App.3d 621, 632; cf. *Allen v. City of Long Beach*, *supra*, 45 Cal.2d 128, 131 [invalidating "provision raising the rate of an employee's contribution . . . from 2 per cent of his salary to 10 per cent"].)

Thus, short of actual abolition, a radical reduction of benefits, or a fiscally unjustifiable increase in employee contributions, the guiding principle is still the one identified by *Miller* in 1977: " 'the governing body may make *reasonable* modifications and changes before the pension becomes payable and that until that time the employee does not have a right to any fixed or definite benefits but only to a substantial or *reasonable* pension.' " (*Miller*, *supra*, 18 Cal.3d 808, 816, italics added.) As made clear by the 1947 decision quoted in *Miller*: "an employee may acquire a vested contractual right to a pension but . . . this right is not rigidly fixed by the specific terms of the legislation in effect during any particular period [the employee] serves," and "the amount, terms and conditions of the benefits may be altered." (*Kern v. City of Long Beach*, *supra*, 29 Cal.2d 848, 855.) Hence the reiteration of reserved legislative power: " '[A] public pension system is subject to the implied qualification that the governing body may make reasonable modifications and changes before the pension becomes payable and that until that time the employee does not have a right to any fixed or definite benefits but only to a substantial or reasonable pension.' " (*Miller*, *supra*, 18 Cal.3d 808, 816.)

The ordinary progression of analysis for an alleged contract clause violation goes as follows: Is there a valid contract to be impaired? If there is a valid contract, has it been impaired? Lastly, is the impairment substantial, meaning was a substantial right secured by the contract extinguished, made invalid, or significantly altered? (E.g., *General Motors Corp. v. Romein* (1992) 503 U.S. 181, 186; *Home Building & Loan Assn. v. Blaisdell* (1934) 290 U.S. 398, 430–431.) "Analysis of a contract clause claim requires inquiry into: ' "(1) the nature and extent of any contractual obligation . . . and (2) the

30

scope of the Legislature's power to modify any such obligation." ' [Citations.] The party asserting a contract clause claim has the burden of 'mak[ing] out a clear case, free from all reasonable ambiguity,' [that] a constitutional violation occurred. [Citation.]" (*Deputy Sheriffs' Assn. of San Diego County v. County of San Diego* (2015) 233 Cal.App.4th 573, 578.)

The contract clauses do not foreclose government action which reflects changing concepts of public policy, concomitantly granting government the power to make illegal that which was previously legal. That power has been exercised over a myriad of products and practices, and has not been stymied simply because a contract was in existence when the ban took effect. (E.g., *Stone v. Mississippi* (1879) 101 U.S. 814 [prohibition of existing state lottery]; *Boston Beer Co. v. Massachusetts* (1877) 97 U.S. 25 [state license to produce liquor invalidated by adoption of state prohibition law].) Such a contract might provide for a rate of interest which a statute later makes usurious and invalid, yet there is no contract clause violation. (*Griffith v. State of Connecticut* (1910) 218 U.S. 563, 571.) Or it might be a contract for transporting freight on public highways at a cost below that fixed by a subsequently established utility commission which is statutorily authorized to fix minimum rates. Abrogation or modification of the contract presents no constitutional violation. (*Stephenson v. Binford* (1932) 287 U.S. 251, 276.) Enacting a new tax or increasing an existing one does not entail constitution exemption of existing contracts. (*National Ice etc. Co. v. Pacific F. Exp. Co.* (1938) 11 Cal.2d 283, 293–295; *Western Contracting Corp. v. State Bd. of Equalization* (1974) 39 Cal.App.3d 341, 350–351.)

Additional examples could be produced only at the risk of unduly prolonging this opinion. The following is a useful summary: " 'The contract clause does not protect expectations that are based upon contracts that are invalid, illegal, [or] unenforceable. . . . Nor does the contract clause protect expectations which are based

31

upon legal theories other than contract, such as quasi-contract or estoppel.' "[21] (*Medina v. Board of Retirement* (2003) 112 Cal.App.4th 864, 871.)

It is without dispute that (1) up to January 1, 2013, there was a contract between MCERA and certain public employees concerning how those employees would be compensated, and (2) that after January 1, 2013, under compulsion of the Pension Reform Act, the agreement was unilaterally altered by MCERA to reduce the scope of compensation that had been accounted as "compensation earnable." The issue here is whether the amendment of section 31461—the only part of AB 197 challenged by plaintiffs and addressed here—qualifies as an "unreasonable" change, a "substantial" impairment, and thus a violation of the state and federal constitutions. There being no factual dispute, the issue is properly resolved as one of law. (See *Teachers' Retirement Bd. v. Genest, supra,* 154 Cal.App.4th 1012, 1028 and decisions cited.) We conclude the dual answer is no: MCERA's implementation of the amended version of section 31461 does not qualify as a substantial impairment of plaintiffs' contracts of employment with its right to a "reasonable" and "substantial" pension. Thus there is no violation of the state and federal constitutions.

Plaintiffs do not—indeed could not—dispute that the Legislature possesses broad power to regulate the conditions of employment and the terms of compensation of those employed in public service. It has already been established that plaintiffs cannot rely on the "must be accompanied by comparable new advantages" language in *Allen v. Board of Administration*, *supra*, 34 Cal.3d 120, to frustrate the application to them of the Pension Reform Act's redefinition of compensation earnable. It has also been shown that plaintiffs adopt an unrealistic notion of the immutability of employees' "vested" rights. Plaintiffs obviously do not assert that the entirety of their contracts of employment have been extinguished. Although plaintiffs do not develop the point, they implicitly assert that their contracts of employment were substantially impaired by (1) the amendment of section 31461 in the Pension Reform Act, and (2) the December 18, 2012 policy change

---

[21] Plaintiffs' attempt to raise a nonconstitutional estoppel claim is examined at fn. 24, *post*.

by MCERA. They challenge only one aspect of how they have been compensated, insisting they have a constitutionally protected right to continue using the old definition of "compensation earnable" when their pension benefits are calculated, and that right will be substantially impaired if the current version of section 31461 is enforced.

The dispositive issue is one of degree only. The extent of the new rule of section 31461 is quite modest, as is the scope of the parties' disagreement. The parties accept that the catalyst for the Pension Reform Act was dire financial predictions necessitating urgent and fundamental changes to improve the solvency of various pension systems, including CERL. They do not dispute that the Legislature's intent in amending section 31461 was to make it illegal after January 1, 2013, for the enumerated items and payments to figure in compensation earnable and the calculation of final compensation. And plaintiffs concede in their opening brief that MCERA's change of policy is purely prospective: MCERA "is applying its policy only to compensation earned after January 1, 2013, meaning that if a member's final compensation period includes pay periods before 2013, the excluded pay items would be included in pension calculations for those pay periods."[22] Moreover, all the parties agree the Pension Reform Act does

---

[22] Because the parties do not make an issue of it, we express no opinion on whether MCERA was constitutionally obligated to take this position.

However, we do note that plaintiffs have an unusual notion of the discretion MCERA may exercise. Based on the Supreme Court's discussion of compensation earnable under section 31461 as it read in 1997 (*Ventura County*, *supra*, 16 Cal.4th 483), plaintiffs assert: "CERL retirement boards do not have complete discretion over what can [be] considered compensation earnable. *Ventura* makes clear that before A.B. 197, compensation paid in cash and which was not overtime was required to be included as compensation earnable. And while it is true that the retirement boards have some discretion to interpret and apply CERL—for example, they have the discretion to include as compensation earnable items not required to be included by CERL [citation]—this discretion is limited by the contours of the statute and the constitution, including the Contracts Clause. Even if it were a discretionary decision for Marin CERA to include these various payments as compensation earnable—which Appellants maintain it was not, because CERL required these payments to be considered compensation earnable—once Marin CERA established their inclusion as part of the pension system, members earned a vested right to the continuation of that benefit."

33

not prohibit public employees from receiving "compensation" from items and payments enumerated in subdivision (b) of section 31461.

So, whatever moral opprobrium it attached to "pension spiking,"[23] the Legislature's "reform" was hardly one-sided. The amendment of section 31461 had no immediate adverse financial impact on employees (save those planning imminent retirement, a group from which plaintiffs exclude themselves) because the items and payments listed in subdivision (b) could still be pocketed as compensation. Those years where employees had received the now prohibited payments would not be erased but would still be included by MCERA in the employees' compensation earnable and final

---

The Supreme Court's discussion of compensation earnable in *Ventura County*, as plaintiffs note, antedated enactment of the Pension Reform Act. Given that "[a]n opinion is not authority for a point not raised, considered, or resolved therein" (*Styne v. Stevens* (2001) 26 Cal.4th 42, 57), *Ventura County* would appear to have little, if any, relevance to the scope and meaning of the subsequently amended language of section 31461 we are considering here. The utility of *Ventura County* is also weakened because none of the words "constitution," "contract," or "impair" were used in the opinion, so it is no authority for an unchanging constitutional dimension to a statute as substantially amended as was section 31461. The permanence plaintiffs attribute to MCERA's exercise of discretion in allowing certain payments to be included in compensation earnable is troubling because it seems to deny MCERA the discretion to change that decision. Plaintiffs also seem to believe that discretion once granted by a statute cannot thereafter be withdrawn. But that is indisputably what the Legislature accomplished with the addition of subdivision (b) to section 31461 and the command that " 'Compensation earnable' does not include, *in any case*" (italics added). At that point—subject to § 31542, subd. (c), quoted at fn. 5, *ante*—MCERA's discretion disappeared because, as we have held, there is no discretion to act "contrary to specific statutory command" (*Karuk Tribe of Northern California v. California Regional Water Quality Control Bd., North Coast Region* (2010) 183 Cal.App.4th 330, 363, fn. 25), and because "the determination of what items were to be included in 'compensation earnable' . . . is *not* subject to a contract right." (*In re Retirement Cases*, *supra*, 110 Cal.App.4th 426, 453.)

[23] See fns. 2, 6, *ante*. At oral argument, plaintiffs' counsel vehemently insisted this term should be confined to those employees looking only to artificially inflate their pensions on the eve of retirement and which had no application to his clients. The plain implication is that none of the individual plaintiffs plan to stop working in the immediate future.

compensation, the basic units of pension computation. In light of the unquestioned need for change, we conclude this one was reasonable.

The very careful examination we have given to the parties' extensive briefing convinces us that plaintiffs are unable to overcome too many fundamental and established principles. Understandably, they focused on what they have lost. This has caused them to lose focus on the essential bilateral nature of the problem. Plaintiffs' insistence on retaining their claimed "vested rights" measured by the former version of section 31461 and *Ventura County* (see fn. 14 & 22, *ante*) has hindered their appreciation of how that right is only to a "reasonable" pension, that the public employee "does not have a right to any fixed or definite benefits" that may be "fixed by the specific terms of the legislation during any particular period." Plaintiffs' unbending resistance to the new section 31461 betrays an inability to accept that "statutory language is subject to the implied qualification that the governing body may make modifications and changes in the system." The qualification "is a necessary one since pension systems must be kept flexible to permit adjustments in accord with changing conditions and at the same time maintain the integrity of the system." (*Kern v. City of Long Beach*, *supra*, 29 Cal.2d 848, 854–855; accord, *International Assn. of Firefighters v. City of San Diego*, *supra*, 34 Cal.3d 292, 300–301; *Miller*, *supra*, 18 Cal.3d 808, 816.)

Restricting their unyielding focus to only their "vested rights" has led plaintiffs to pay insufficient attention to the ever-present possibility of legislative involvement, one of the " ' "essential attributes of sovereign power" ' " that is always to be consulted. (*Home Building & Loan Assn. v. Blaisdell, supra,* 290 U.S. 398, 435; *Allen v. Board of Administration*, *supra*, 34 Cal.3d 114, 119.) The Legislature's involvement would obviously take statutory form, which is relevant because " '[t]he terms and conditions of [public] employment are fixed by statute and not by contract. . . . The statutory provisions controlling the terms and conditions of [public] employment cannot be circumvented by purported contracts in conflict therewith.' " (*Martin v. Henderson* (1953) 40 Cal.2d 583, 590–591.) Thirteen years ago this court made the same point in connection with the enforced downward adjustment of anticipated pension benefits:

" 'The contractual basis of a pension right is the exchange of an employee's services for the pension right *offered by . . . statute.*' " (*In re Retirement Cases*, *supra*, 110 Cal.App.4th 426, 447, italics added.)  We also left no doubt that private agreement could not substitute:  "the determination of what items were to be included in 'compensation earnable,' . . . is *not* subject to a contract right."  (*Id.* at p. 453.)

Plaintiffs make no real effort to demonstrate why the Pension Reform Act's modification of the definition of compensation earnable does not "bear some material relation to the theory of a pension system and its successful operation" (*Allen v. City of Long Beach*, *supra*, 45 Cal.2d 128, 131), or is not a "reasonable modification" of the pension system projected to plunge into a fiscal and actuarial abyss.  (See *Miller*, *supra*, 18 Cal.3d 808, 816.)  Plaintiffs make numerous references to *In re Retirement Cases*, but they ignore our statement that statutory changes to "the determination of what items were to be included in 'compensation earnable' . . . is *not* subject to a contract right."  (*Id.* at p. 453.)  Perhaps because they believe the 1983 *Allen* decision requires that there must first be a quid pro quo, plaintiffs do not mention the economic storm clouds that attended enactment of the Pension Reform Act, or how their presence was perceived by the Legislature as a spur to fundamental change.  Repeated invocation of the inviolability of their "vested rights" cannot substitute for analysis of just how the change to section 31461 demonstrates that employees will not retire with a "substantial" or "reasonable" pension.  (See *Betts v. Board of Administration*, *supra*, 21 Cal.3d 859, 863; *Miller*, *supra*, 18 Cal.3d 808, 816; *Wallace v. City of Fresno*, *supra*, 42 Cal.2d 180, 183; *Kern v. City of Long Beach*, *supra*, 29 Cal.2d 848, 855.)  Unfortunately, the exercise of that power can be a harsh reminder to employees that " 'a public pension system is subject to the implied qualification that the governing body may make reasonable modification and changes before the pension becomes payable and that until that time the employee does not have a right to any fixed or definite benefits' " (*Miller*, *supra*, at p. 816), which can mean that "any one or more of the various benefits . . . may be wholly eliminated prior to the time they become payable," so long as "the employee retains the right to a substantial pension."  (*Packer v. Board of Retirement*, *supra*, 35 Cal.2d 212, 218.)

In the circumstances presented, plaintiffs have failed "to make out a clear case, free from all reasonable ambiguity" and "reasonable doubt," that they are the victims of a constitutional violation. (*Floyd v. Blanding* (1879) 54 Cal. 41, 43; *Deputy Sheriffs' Assn. of San Diego County v. County of San Diego*, *supra*, 233 Cal.App.4th 573, 578.) Put another way, after January 1, 2013, payment of any of the items specified in section 31461, subdivision (b), could not be deemed salary already earned pursuant to a contract that enjoyed constitutional protection. (See, e.g., *White v. Davis*, *supra*, 30 Cal.4th 528, 566, 571; *Miller*, *supra*, 18 Cal.3d 808, 815; *Kern v. City of Long Beach*, *supra*, 29 Cal.2d 848, 853.)

We emphasize the limited nature of our holding. The Legislature's change to the definition of compensation earnable was expressly made purely prospective by the Pension Reform Act. MCERA's responsive implementation was also explicitly made prospective only. (See fn. 9 and accompanying text, *ante*.) Neither altered the status of compensation or payments accrued prior to January 1, 2013: what had previously met the old definition of compensation earnable would still be included by MCERA in calculating worker pensions. Nothing in AB 197 prevents employers from compensating employees with any of the items or payments specified in subdivision (b) of section 31461, a point on which the parties are unanimous.

Given that this case never cleared the pleading stage, we are in effect deciding an odd hybrid—whether the Pension Reform Act is unconstitutional on its face as it applies to the claimed vested contractual rights of MCERA employees. That is a limited issue of legislative power considered in an undisputed factual context.[24] Because we conclude

---

[24] In the final two pages of their brief, and without providing much detail, plaintiffs maintain the allegations of their petition can be "fleshed out" to "establish a right to the continued calculation of their pension benefits under equitable estoppel theories," which forms the basis for their conclusion that the trial court "abused its discretion by refusing to grant leave to amend." Plaintiffs are defeated by three firmly established and interlocking principles, all of which are found in a 1979 decision by our Supreme Court, a decision unusually apposite because it involved a county employee's rejected claim for overtime pay that was initially allowed by statute, but thereafter cancelled by statute prior to the employee's retirement: *Longshore v. County of Ventura*

(1979) 25 Cal.3d 14. The first principle is "[a] public employee is entitled only to such compensation as is expressly and specifically provided by law." (*Id*. at pp. 22–23.) The second, "[t]he statutory compensation rights of public employees are strictly limited and cannot be altered or enlarged by conflicting agreements between the public agency and its employee." (*Id*. at p. 23.) And the third, "no court has expressly invoked principles of estoppel to contravene directly any statutory or constitutional limitations." (*Id*. at p. 28.) The employee's attempt to recover compensation failed because "[a]pplication of estoppel to enlarge [the employee's] . . . retroactive compensation . . . would effectively purport to enforce an employment contract in contravention of law." (*Id*. at p. 29.)

Any promises or representations made to plaintiffs could have no validity if contrary to plain statutory language forbidding what plaintiffs wish to have recognized. As we said in 1959, "there is no estoppel to prove illegality." (*Holland v. Morgan & Peacock Propertie*s (1959) 168 Cal.App.2d 206, 211.) Indeed, even if the agreements and understandings had been reduced to writing, this court has recognized that they could not displace clear statutory language or delay its implementation. (See *In re Retirement Cases*, *supra*, 110 Cal.App.4th 426, 453 ["the determination of what items [are] to be included in 'compensation earnable' . . . is *not* subject to a contract right"], 447 [" 'The contractual basis of a pension right is the exchange of an employee's services for the pension right *offered by statute*,' " italics added].) In these circumstances, MCERA could never have the authority to create a right to receive pension benefits. (E.g., *City of San Diego v. Haas* (2012) 207 Cal.App.4th 472, 495 ["only the [legislative body] has the power to grant employee benefits, and [the retirement association] exceeds its authority when it attempts to 'expand pension benefits' beyond those the [legislative body] has granted," italics omitted]; cf. *Miller*, *supra*, 18 Cal.3d 808, 814 [Legislature's power to control " 'the terms and conditions of civil service employment cannot be circumvented by purported contracts in conflict therewith' "]; *Retired Employees Assn. of Orange County v. County of Orange* (2011) 52 Cal.4th 1171, 1176 ["a county may be bound by an implied contract . . . if there is no legislative prohibition against such arrangements, such as a statute or ordinance"], 1183 ["as long as there is no statutory prohibition against such an agreement"].) Plaintiffs would have this court elevate private agreement over public policy, frustrating lawfully enacted legislation that in plain effect declared such agreement illegal.

In sum, even if plaintiffs could present allegations establishing a factual basis for a nonconstitutional estoppel (see *Medina v. Board of Retirement*, *supra*, 112 Cal.App.4th 864, 871), the legal hurdles for success are insurmountable. This is a situation where the nature of plaintiffs' claim is clear, but there can be no liability on that claim as a matter of law. Accordingly, there could be no prejudicial error in denying plaintiffs an opportunity to amend their complaint to set up an estoppel that would prevent MCERA from implementing and enforcing the new definition of compensation earnable set out in subdivision (b) of section 31461. (See *Schonfeldt v. State of California* (1998)

plaintiffs had no such rights after January 1, 2013, we have no occasion to consider whether any other modification effected by AB 197 qualifies as a reasonable alteration of employee contractual or pension rights.

## DISPOSITION

The judgment is affirmed.


_____

Richman, J.


We concur:


_____

Kline, P.J.


_____

Miller, J.

_____

61 Cal.App.4th 1462, 1465 ["If there is no liability as a matter of law, leave to amend should not be granted"].)

| | |
|---|---|
| Trial Court: | Marin County Superior Court |
| Trial Judge: | Honorable Roy O. Chernus |
| Attorneys for Plaintiffs and Appellants Marin Association of Public Employees; Catherine Hall: | Leonard Carder, Peter Warren Saltzman, Arthur Wei-Wei. Liou; |
| Attorneys for Plaintiff and Appellant Service Employees International Union Local 1021: | Weinberg, Roger & Rosenfeld, Vincent A. Harrington, Jr., Kerianne Ruth Steele, Anne I. Yen, Sean Daniel Graham, Caren Pamela Spencer; |
| Attorneys for Plaintiffs and Appellants Marin County Fire Department Firefighters' Association; Marin County Management Employees Association; Joel Chandler; and Angelo Sacheli: | Carroll, Burdick & McDonough, Gregg McLean Adam, Amber Lynn Griffiths; Messing Adam & Jasmine, Gregg McLean Adam, Jonathan Dennis Yank; |
| Attorneys for Defendants and Respondents Marin County Employees' Retirement Association; Board of Retirement of the Marin County Employees' Retirement Association: | Manatt, Phelps & Phillips, Ashley Kathleen Dunning, Kelly L. Knudson, Benjamin G. Shatz, Michael V. Toumanoff; Nossaman, Ashley Kathleen Dunning, Michael V. Toumanoff; |
| Attorneys for Intervenor and Respondent: | Kamala D. Harris, Attorney General, Douglas J. Woods, Assistant Attorney General, Constance L. LeLouis, Rei R. Onishi, Anthony P. O'Brien, Deputy Attorneys General |