Filed 8/10/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| PETER J. NOWICKI,<br><br>        Plaintiff and Appellant,<br>v.<br><br>CONTRA COSTA COUNTY EMPLOYEES' RETIREMENT ASSOCIATION,<br><br>        Defendant and Respondent. | A160337<br><br>(Contra Costa County<br>Super. Ct. No. MSC17-01266) |

Plaintiff Peter J. Nowicki appeals from the trial court's judgment in favor of defendant Contra Costa County Employees' Retirement Association (CCCERA) following the denial of Nowicki's fourth amended petition for writ of mandate (petition), filed pursuant to Code of Civil Procedure section 1085. Nowicki had alleged in his petition that CCCERA and its governing Board of Retirement (Board) improperly reduced his retirement benefits retroactively, pursuant to Government Code section 31539.[1]  On appeal, he contends the trial court (1) utilized an incorrect and overly deferential standard of review; (2) ignored significant procedural errors by the Board that violated his due process rights; and (3) ignored various problems with the Board's decision, including permitting it to misconstrue and misuse the Brown Act (Gov. Code,

---

[1] All statutory references are to the Government Code unless otherwise indicated.

§ 54950 et seq.). Because we conclude the Board's decision to reduce Nowicki's retirement allowance was an abuse of discretion, we shall reverse the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Nowicki was employed with the Moraga-Orinda Fire District (Fire District) from 1983 until 2009. He began as a paramedic-firefighter and ultimately became fire chief on July 10, 2006. The initial contract between Nowicki and the Fire District, which was not negotiable, was for a four-year term, with an annual salary of $173,000. Under the terms of the contract, he was eligible for an annual salary adjustment as determined by the Fire District's board, following a performance evaluation.

On February 6, 2008, Nowicki and the Fire District entered into a first amendment to Nowicki's employment contract, which was retroactive to July 10, 2007, when the parties had "entered into dialogue" about the amendments. The first amendment both increased Nowicki's annual salary from $173,000.00 to $186,218.84, and allowed a one-time "vacation sell-back" of 200 hours of accrued vacation time.

On February 8, 2008, Nowicki sold back 200 hours of previously accrued vacation time.

On November 25, 2008, Nowicki informed a CCCERA employee of upcoming final changes to his contract, which were to be approved by the Fire District's board on December 10, and of his intention to retire on January 30, 2009.

On December 10, 2008, Nowicki and the Fire District entered into a second amendment to his employment contract, which added eight hours to the 20 hours of vacation credit he had accrued monthly in the original contract. It also credited him with 80 hours of annual administrative leave,

2

effective July 1 of each year, which could be converted to vacation leave. Finally, it gave him the right to accrue and sell back unused holidays, retroactive to January 1, 2008. All of the other changes were retroactively effective on July 1, 2008. The second amendment also permitted Nowicki to sell back up to 260 hours of accrued vacation leave annually.

Three days later, on December 13, 2008, Nowicki sent an email informing all Fire District personnel of his intent to retire, effective January 30, 2009.

On December 31, 2008, Nowicki sold back 60 hours of vacation leave. On January 5, 2009, he sold back another 260 hours of vacation leave.

Nowicki retired on January 30, 2009, two and one-half years into his four-year term as fire chief, for personal reasons.

As a Fire District employee, Nowicki was a member of CCCERA, a defined benefit public employees' retirement system (see § 31450 et seq.), which administers pensions for Contra Costa County. Under his contract as fire chief, Nowicki was eligible for retirement benefits under the then applicable formula, which took into account a member's highest annual "compensation earnable." When Nowicki retired on January 30, 2008, his retirement allowance of $20,076.00 per month was based on the total of his final year's salary plus the vacation leave and holiday cash-outs taken during his final year of employment.

In late 2013, the Board assigned CCCERA staff to compare the final compensation of county retirees that was used to determine their pension benefit with the compensation earned in the period leading up to the final year, "to isolate incidents where that ratio was higher than average." This process was known as the "lookback project."

3

On August 5, 2015, the Board sent Nowicki a letter informing him that in 2014, it had been reviewing "past incidents of unusual compensation increases at the end of employment" to determine if pension spiking had occurred "through members' receipt of pay items that were not earned as part of their regularly recurring employment compensation during their careers." The letter further stated the Board was scheduled "to hear the matter of whether adjustments to your retirement allowance are warranted" on September 9, and that, before adjusting Nowicki's retirement benefits, it would give him the opportunity to present the Board with his position and any relevant information on the issue.

On August 7, 2015, the Board sent Nowicki a copy of a memorandum and supporting documents regarding the grounds on which the Board would consider adjusting Nowicki's retirement allowance, pursuant to section 31539, which permits a retirement board to correct any error made in the calculations of a retired member's monthly allowance, if certain conditions exist.

Following a September 9, 2015 open public meeting at which the Board's concerns were addressed, on September 11, 2015, CCCERA sent Nowicki a letter informing him that the Board had determined that he had caused his final compensation to be improperly increased at the time of retirement, and that his retirement allowance would therefore be reduced from $20,448.09 to $14,667.74 per month. In a September 21, 2015 letter, CCCERA further informed Nowicki that his retirement allowance had been overpaid from January 30, 2009, through September 1, 2015, and that Nowicki would be responsible for repaying the overpayments plus interest, which then totaled $585,802.90.

4

On October 13, 2015, Nowicki filed a petition for writ of administrative mandate pursuant to Code of Civil Procedure section 1094.5 against CCCERA, requesting an order rescinding the Board's decision to reduce his pension benefit and reinstating that benefit as originally calculated. On February 8, 2017, Nowicki dismissed his petition for administrative mandate without prejudice after filing a complaint for injunctive relief and damages in federal district court on February 7, alleging causes of action for, inter alia, violation of due process under the federal and state Constitutions.[2]

On June 27, 2017, the federal district court granted CCCERA's motion to dismiss the complaint with leave to amend. (*Nowicki v. Contra Costa County Employees' Retirement Assn.* (N.D.Cal., June 27, 2017, No. 17-cv-00629) [nonpub. opn.].) Then, on July 17, 2017, after Nowicki failed to file an amended complaint, the federal district court entered judgment in favor of, inter alia, CCCERA. The federal district court dismissed all federal causes of action with prejudice and dismissed all state claims without prejudice to any right Nowicki had to timely assert them in state court.

On July 10, 2017, Nowicki filed a first amended petition for writ of administrative mandate and complaint in state court, which included a cause of action against CCCERA for administrative mandate pursuant to Code of Civil Procedure section 1094.5, as well as causes of action alleging due process and equal protection violations under the California Constitution, breach of contract, breach of the duty of good faith and fair dealing, promissory estoppel, and also requesting declaratory relief.

---

[2] On January 11, 2021, we granted CCCERA's unopposed request for judicial notice of the October 13, 2015 petition for writ of administrative mandate, the Contra Costa County Superior Court docket showing the February 2017 dismissal of that petition without prejudice, and the federal district court complaint.

On November 3, 2017, the trial court overruled CCCERA's demurrer as to Nowicki's administrative mandate cause of action in the first amended complaint, sustained the demurrer with leave to amend as to the fourth cause of action for denial of equal protection under the California Constitution, and sustained the demurrer without leave to amend as to the remaining causes of action, including the due process claim under the California Constitution.

On November 15, 2017, Nowicki filed a second amended petition for writ of administrative mandate and complaint, which included causes of action for administrative mandate pursuant to Code of Civil Procedure section 1094.5 and for denial of equal protection under the California Constitution.

On February 13, 2018, the trial court sustained CCCERA's demurrer to the second amended complaint without leave to amend as to the equal protection cause of action and with leave to amend the administrative mandate claim to "seek review pursuant to ordinary mandamus" under Code of Civil Procedure section 1085.[3]

After Nowicki filed a third amended petition for writ of administrative mandate, the parties met and conferred regarding objections to the petition raised by CCCERA, and submitted a stipulation to the court on March 12, 2018, under which CCCERA would not object to the filing of a fourth amended complaint for writ of ordinary mandate pursuant to Code of Civil Procedure section 1085.

On March 20, 2018, Nowicki filed his fourth amended writ petition against CCCERA, which included a single cause of action for writ of mandate

_____

[3] The trial court also sustained without leave to amend the Fire District's demurrer to the second amended complaint. In an August 27, 2019 opinion, a panel of this Division affirmed the trial court's order. (*Nowicki v. Moraga-Orinda Fire District* (Aug. 18, 2019, A153833) [nonpub. opn.].)

under Code of Civil Procedure section 1085, alleging that the Board had abused its discretion when it found that he had violated Government Code section 31539. This petition is the operative pleading underlying Nowicki's current appeal.

In a February 19, 2020 order, following briefing and argument, the trial court denied Nowicki's petition, finding that he had not met his burden of establishing that the Board's decision to decrease his monthly allowance was an abuse of discretion or that the administrative proceedings before the Board had violated his due process rights.

The court entered judgment in favor of CCCERA on April 15, 2020.

On June 11, 2020, Nowicki filed a notice of appeal.

## DISCUSSION

### I. *Standard of Review—In the Trial Court and on Appeal*

Before articulating the standard of review on appeal, we must first address Nowicki's contention that the trial court improperly reviewed the Board's action for substantial evidence under the principles of ordinary mandate pursuant to Code of Civil Procedure section 1085, when it was instead required to independently review the Board's action under the rules of administrative mandate pursuant to Code of Civil Procedure section 1094.5.[4]

---

[4] As a preliminary matter, CCCERA argues that Nowicki abandoned his claim under Code of Civil Procedure section 1094.5 when he amended his petition to request relief under Code of Civil Procedure section 1085, after the court sustained CCCERA's demurrer with leave to amend as to the Code of Civil Procedure section 1094.5 cause of action. (See *City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 870.) Even assuming Nowicki did not abandon this claim by failing to file an appeal immediately after the court sustained the previous demurrer with leave to amend, as we shall discuss, *post*, we find that the court properly concluded that review under Code of Civil Procedure section 1085 was appropriate.

In *Shelden v. Marin County Employees' Retirement Association* (2010) 189 Cal.App.4th 458, 460 (*Shelden*), Division Five of this District addressed this same question in a case involving a county retirement association's determination that a county employee was not entitled to inclusion of pay for voluntary overtime work in his retirement benefits. After the county retirement board rejected his appeal, it referred the matter to an administrative law judge for an administrative hearing. Following an evidentiary hearing, the administrative law judge found that the employee was not entitled to the requested additional benefit, and the retirement board then adopted that decision as its own. (*Id.* at p. 461.) The employee filed a writ petition under both Code of Civil Procedure sections 1085 and 1094.5, and the trial court rejected his claims. (*Shelden*, at pp. 461–462.)

On appeal, the appellate court first addressed the appropriate standard of review, observing that many cases had held that the question of whether a retirement board correctly calculated benefits under applicable laws must be reviewed under principles of ordinary mandate. (*Shelden*, *supra*, 189 Cal.App.4th at p. 462 [citing cases].) Although the employee maintained that administrative mandate was appropriate in that case because the retirement association "in fact provided him with an administrative hearing," the appellate court held that "administrative mandamus is appropriate to review only an administrative decision that is made 'as the result of a proceeding in which by law a hearing is required to be given . . . .' (Code Civ. Proc., § 1094.5, subd. (a).) If the administrative agency provides a hearing but it was not required by law, administrative mandamus does not apply. [Citation.]" (*Shelden*, at pp. 462–463, citing *Keeler v. Superior Court* (1956) 46 Cal.2d 596, 599; accord, *OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 139–140; compare *Dickey v. Retirement Bd.* (1976) 16 Cal.3d 745, 749 [addressing

8

proper standard for reviewing an agency decision pursuant to Code of Civil Procedure section 1094.5, which depends on whether a vested right was involved]; *Strumsky v. San Diego County Employees' Retirement Assn.* (1974) 11 Cal.3d 28, 32 [same].)

In this case, section 31539, the statute under which CCCERA decreased Nowicki's pension, allows a retirement board, "in its discretion," to correct errors made in the calculation of members' retirement benefits. (§ 31539, subd. (a).) While CCCERA did in fact provide Nowicki with a hearing before the Board, section 31539 contains no requirement that a hearing be held. Thus, because CCCERA's decision was *not* "made as the result of a proceeding in which by law a hearing is required to be given" (Code Civ. Proc., § 1094.5, subd. (a)), the rules governing administrative mandate did not apply and the trial court properly proceeded to analyze Nowicki's claim under the rules of ordinary mandate. (Code Civ. Proc. § 1085; see *OTO, L.L.C. v. Kho*, *supra*, 8 Cal.5th at pp. 139–140; *Keeler v. Superior Court*, *supra*, 46 Cal.2d at p. 599; *Shelden*, *supra*, 189 Cal.App.4th at pp. 462–463; see also § 31542, subd. (b) [under 2013 law, after notice of a final board determination that a retiring county employee received compensation to enhance his or her retirement benefit, employee "may obtain judicial review of the board's action by filing a petition for writ of mandate within 30 days of the mailing of that notice"].)

"The standard of review for traditional mandamus (Code Civ. Proc. § 1085), calls for the trial court to determine whether ' "the agency's decision was arbitrary, capricious or entirely lacking in evidentiary support, contrary to established public policy, unlawful, or procedurally unfair." ' [Citation.] Under this deferential standard of review, the court's role is to 'ensure that the administrative agency has adequately considered all relevant factors, and

9

has demonstrated a rational connection between those factors, the choices made, and the purposes of the enabling statute.' [Citations.]" (*Ruegg & Ellsworth v. City of Berkeley* (2021) 63 Cal.App.5th 277, 298 (*Ruegg*).) " ' "Although mandate will not lie to control a public agency's discretion, that is to say, force the exercise of discretion in a particular manner, it will lie to correct abuses of discretion.  [Citation.]  In determining whether an agency has abused its discretion, the court may not substitute its judgment for that of the agency, and if reasonable minds may disagree as to the wisdom of the agency's action, its determination must be upheld.  [Citation.]" [Citation.]' " (*Vallejo Police Officers Assn. v. City of Vallejo* (2017) 15 Cal.App.5th 601, 611–612.)

"The appellate court applies the same standard of review as the trial court, reviewing the agency's action de novo.  [Citations.]" (*Ruegg*, *supra*, 63 Cal.App.5th at p. 298.)  In addition, we independently review legal issues and, "[t]o the extent that facts are disputed," we review them under the substantial evidence standard.  (*McIntyre v. Sonoma Valley Unified School Dist.* (2012) 206 Cal.App.4th 170, 179 (*McIntyre*).)

## II.  *Relevant Legal Principles*

CCCERA is a retirement system governed by the County Employees Retirement Law of 1937 (CERL) (§ 31450 et seq.).  As such, its Board has a fiduciary responsibility to act for the benefit of all retirement plan members.  (Cal. Const., art. XVI, § 17; cf. *McIntyre v. Santa Barbara County Employees' Retirement System (*2001) 91 Cal.App.4th 730, 734 [a retirement Board cannot fulfill its fiduciary responsibilities "unless it investigates applications and pays benefits only to those members who are eligible for them"].)

In recent years, significant changes have been made to the laws governing public employees' pensions.  In 2012, the Legislature enacted the

California Public Employees' Pension Reform Act of 2013 (PEPRA) (Stats. 2012, ch. 296, § 1), which "substantially revised the laws governing the pension plans of the state's public employees," including county employees covered by CERL. (*Alameda County Deputy Sheriff's Assn. v. Alameda County Employees' Retirement Assn.* (2020) 9 Cal.5th 1032, 1051, 1052 (*Alameda County*); see also *Marin Assn. of Public Employees v. Marin County Employees' Retirement Assn.* (2016) 2 Cal.App.5th 674, 704–705 (*Marin County*) review granted Nov. 22, 2016, S237460, review dismissed Sept. 23, 2020 ["the catalyst for [PEPRA] was dire financial predictions necessitating urgent and fundamental changes to improve the solvency of various pension systems, including CERL"].) Changes under PEPRA included amendments to section 31461, subdivision (b)(2), which redefined "compensation earnable" for county employees: " 'Compensation earnable' does not include, in any case, the following: [¶] . . . [¶] (2) Payments for unused vacation, annual leave, personal leave, sick leave, or compensatory time off, however denominated, whether paid in a lump sum or otherwise, in an amount that exceeds that which may be earned and payable in each 12-month period during the final average salary period, regardless of when reported or paid." The PEPRA amendments, including changes to section 31461, subdivision (b)(2), apply only to employees who retire after its January 2013 effective date. (*Alameda County*, at p. 1092.)

In *Alameda County*, our Supreme Court "emphasize[d] that there is nothing inherently abusive in the practices addressed by section 31461, subdivision (b)(2) through (4), at least when divorced from their pension consequences. Accepting voluntary on-call duty and cashing out unused leave time to the extent permitted by an employer are ordinary practices that serve proper public policy interests. Yet by not expressly excluding such

11

payments when determining a county employee's pension benefit, the pre-PEPRA definition of compensation earnable allowed an employee to considerably increase his or her pension benefit by volunteering for a large quantity of on-call duty or by accumulating and cashing out a large quantity of unused leave time during the final compensation period.  Because such enhancements are arguably inconsistent with the underlying concept of compensation earnable, which is intended to reflect pay for work ordinarily performed during the course of a year, these types of enhancements have been characterized as pension spiking." (*Alameda County, supra,* 9 Cal.5th at p. 1063; see *Marin County*, *supra*, 2 Cal.App.5th at p. 682 ["pension spiking" has been defined as " '[t]he practice of increasing [an employee's] retirement allowance by increasing final compensation or including various non-salary items (such as unused vacation pay) in the final compensation figure used in the [employee's] retirement benefit calculations, and which has not been considered in prefunding of the benefits' "].)

Section 31542, also enacted as part of PEPRA (Stats. 2012, ch. 296, § 29), is the mechanism for addressing suspected pension spiking by county employees who retire after the effective date of PEPRA.  Specifically, subdivision (a) of section 31542 requires each retirement board to "establish a procedure for . . . determining whether an element of compensation was paid to enhance a member's retirement benefit," and gives the member or employer the opportunity to "present evidence that the compensation was not paid for that purpose."  Section 31542 is thus "clearly intended to serve as the mechanism for calculating the pension of an employee about to retire" (*Marin County*, *supra*, 2 Cal.App.5th at p. 693), to ensure that the employee's retirement allowance comports with the new requirements and limitations of PEPRA.

Section 31539, the statute at issue in this case, was enacted in 2004 (Stats. 2004, ch. 466, § 1, eff. Jan. 1, 2005), long before the enactment of PEPRA, as part of CERL.

Section 31539 provides in relevant part:

"(a) The board of retirement may, in its discretion, correct any error made in the calculation of a retired member's monthly allowance or any other benefits under this chapter, if either of the following exist:

"(1) The error in the calculation of the member's monthly allowance or other benefits under this chapter was made as a result of fraudulent reports for compensation made, or caused to be made, by the member for his or her own benefit.

"(2) The member caused his or her final compensation to be improperly increased or otherwise overstated at the time of retirement and the system applied that overstated amount as the basis for calculating the member's monthly retirement allowance or other benefits under this chapter.

"(b) The retirement allowance or other benefits under this chapter with respect to a retired member described in subdivision (a) shall be adjusted prospectively to the amount that would have been payable if the overstatement of the member's final compensation had not occurred.

"(c) Adjustment of the member's retirement allowance or other benefits may also be implemented retroactively and include the collection or return of the overpayment of benefits. . . .

"(d) The rights and remedies provided in this section are in addition to any other rights and remedies any party may have at law or in equity. Nothing in this section shall preclude any party from instituting an action for declaratory or other relief in lieu of proceeding under this section.

13

"(e) The period of limitation of actions under this section shall be 10 years and that period shall commence either from the date of payment or upon discovery of the facts described in subdivision (a), whichever date is later. . . ."

We are aware of no appellate court that has yet construed or applied section 31539.

### III. *Whether the Board's Decision Was an Abuse of Discretion*

Following the September 9, 2015 hearing in this matter, the Board stated in a letter to Nowicki that it had determined, pursuant to section 31539, that he had "caused" his final average salary "to be improperly increased at the time of retirement, for which the Board had taken action to adjust future benefit payments accordingly and recover all past overpayments, with interest. (See § 31539, subds. (a)(2), (b), (c).)

In its order denying Nowicki's petition for writ of mandate, the trial court deferred to the Board on the question of what conduct constitutes impropriety under subdivision (a)(2) of section 31539, stating that the "Board is uniquely qualified to make the determination of what constitutes an 'improper increase,' given its plenary authority over administration of the system and the court should accord great weight to the Board's determination," and, in addition, that it is for the Board to determine in the first instance whether a retiree unreasonably "engineered" his or her increased compensation, as it found that Nowicki had done. The court concluded that the Board's decision in this case was not an abuse of discretion, considering (1) the evidence of Nowicki's end-of-career conduct and violations of the open meeting requirements of the Brown Act (§ 54950), and (2) the record showing that "the Board adequately considered all relevant

factors, and ha[d] demonstrated a rational connection between those factors, the choice made, and the purpose of the enabling statute."

On appeal, Nowicki essentially contends the Board abused its discretion when it found he had improperly caused his final compensation to be increased, pursuant to subdivision (a)(2) of section 31539. He argues that the record contains no evidence of impropriety on his part, given that he acted to increase his final year's compensation "under CCCERA's own rules with the assistance of its staff" and that he "simply sold benefit accruals back in his final year, as he had in prior years."[5]

This court addressed the concept of abuse of discretion in *People v. Jacobs* (2007) 156 Cal.App.4th 728 (*Jacobs*), ending our discussion with this observation: "In *Concord Communities v. City of Concord* (2001) 91 Cal.App.4th 1407, 1417, our colleagues in Division Four of this court observed that 'Abuse of discretion has at least two components: a factual component . . . and a legal component. [Citation.] This legal component of discretion was best explained long ago in *Bailey v. Taaffe* (1866) 29 Cal. 422, 424: "The discretion intended, however, is not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal

_____

[5] CCCERA argues that Nowicki waived any claims related to the sufficiency of the evidence due to his failure to set forth all of the evidence supporting the judgment in his opening brief. Nowicki framed his arguments about the lack of support for the Board's determinations as problems that were ignored by the trial court due to the overly deferential standard of review, which included allowing the Board to misconstrue and misuse the Brown Act. Despite this inartful presentation of the issue and his focus on an inapplicable standard of review (see Code Civ. Proc., § 1094.5), and considering the fact that the pertinent evidence is undisputed, we find that Nowicki has included adequate facts and discussion in his briefing to preserve for appeal the question of whether the Board's decision that he had acted "improperly" pursuant to subdivision (a)(2) of section 31529 was not supported by the evidence and was, therefore, an abuse of discretion.

principles.  It is not a mental discretion, to be exercised *ex gratia*, but a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . ." ' " (*Jacobs*, at pp. 737–738.)

To determine whether the Board abused its discretion in this case when it concluded that it had to correct errors in the calculation of Nowicki's monthly allowance, pursuant to section 31539, subdivision (a)(2), we will address two related issues:  first, we must ascertain the meaning of "improperly," a word whose meaning is dependent on the context; and second, we must determine whether the evidence of Nowicki's pre-retirement conduct supports a finding that he caused his "final compensation to be improperly increased or otherwise overstated at the time of retirement," under a correct reading of the statute.  (§ 31539, subd. (a)(2).)

### A.  *Interpretation of Section 31539, Subdivision (a)(2)*

The subdivision of section 31539 at issue here states:  "(a) The board of retirement may, in its discretion, correct any error made in the calculation of a retired member's monthly allowance or any benefits under this chapter if either of the following exist:  [¶] . . . [¶] (2) The member caused his or her final compensation to be improperly increased or otherwise overstated at the time of retirement and the system applied that overstated amount as the basis for calculating the member's monthly retirement allowance or other benefits under this chapter."  (§ 31539, subd. (a)(2).)

In his memorandum to the Board regarding the legal basis for reducing Nowicki's pension, the Board's fiduciary counsel noted that there "were no reported court decisions that have interpreted or applied section 31539" and the statute itself "does not provide express guidance on what is to be considered an 'improper increase' in compensation."  However, according to

16

the Board's counsel, "the Board is vested with discretionary authority to make that determination," and, "[i]n the context of public employment and public employee retirement allowances . . . , we believe that indices of impropriety could include actions taken to obtain a retirement benefit not otherwise available to the individual, for which inadequate contributions were collected to support the benefit, and that were done in a manner to evade public scrutiny. In this instance, it appears without dispute that Nowicki caused all of these to happen with his final compensation."[6] At the conclusion of his memorandum, counsel observed that the Board had "a fiduciary obligation to pay only the correct amount of benefits to its members."

Discerning the purpose of section 31539 and, in particular, the meaning of "improperly," as used in subdivision (a)(2), is a question of statutory interpretation, a legal issue we review de novo. (See *Ruegg*, *supra*, 63 Cal.App.5th at p. 301; *McIntyre*, *supra*, 206 Cal.App.4th at p. 179.)

"In construing statutes, we aim 'to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law.' [Citations.] We look first to the words of the statute, 'because the statutory language is generally the most reliable indicator of

---

[6] At the subsequent Board hearing, counsel's PowerPoint presentation included a slide describing how Nowicki's conduct satisfied the elements of improper increases under section 31539:

"Member causation: Nowicki initiated and actively participated in obtaining the increases[.]

"Improper increases: Granted retroactively for work previously performed; no prior right to cash-out; negotiated in secret without public notice or participation; done for express purpose of spiking benefit[.]

"Done at retirement: Nowicki knew he was going to retire imminently; all increases inked within the final compensation year[.]"

17

legislative intent.' [Citations.] [¶] When the statutory text is ambiguous, or it otherwise fails to resolve the question of its intended meaning, courts look to the statute's legislative history and the historical circumstances behind its enactment. [Citation.] Finally, the court may consider the likely effects of a proposed interpretation because ' "[w]here uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation." ' [Citations.]" (*Klein v. United States* (2010) 50 Cal.4th 68, 77 (*Klein*).)

First, it is beyond dispute that the Board has a fiduciary duty to act for the benefit of all CCCERA members and to pay benefits only to eligible members (see Cal. Const., art. XVI, § 17; *McIntyre v. Santa Barbara County Employees' Retirement System*, *supra*, 91 Cal.App.4th at p. 734) and that its decision in this case may be overturned only upon a finding that it abused its discretion when it determined that Nowicki's retirement allowance had to be adjusted under section 31539. (See *Vallejo Police Officers Assn. v. City of Vallejo*, *supra*, 5 Cal.App.5th at p. 611; *Jacobs*, *supra*, 156 Cal.App.4th at pp. 737–738.)

However, this does not mean that the Board—and each county retirement board in the state—is free to subjectively construe and apply the language in section 31539, subdivision (a)(2), without any regard to its purpose or the Legislature's intent in enacting that statute, as CCCERA seems to believe. (See *Irvin v. Contra Costa County Employees' Retirement Assn.* (2017) 13 Cal.App.5th 162, 172.) In *Irvin*, Division One of this District rejected a similar claim by CCCERA in a case involving interpretation of another statute enacted as part of CERL. As the court explained, CCCERA's Board "is but one of 20 county retirement boards, all of which have responsibility for administering CERL within their jurisdictions. Deference

18

to the interpretation of each county board could result in inconsistent interpretations of [the statute in question] among the counties having adopted it, with [entitlement to certain] benefits in one county but not in a neighboring county. Such inconsistency in the application of a single state statute is inappropriate, if not impermissible." (*Irvin*, at p. 172.) The court therefore "g[a]ve the Board's interpretation the respect to which a litigant's views are entitled, but [did] not defer to it." (*Id.* at p. 173.) Likewise, in the present case, it is for this court to construe section 31539, subdivision (a)(2), without particular deference to the Board's interpretation. (See *Irvin*, at p. 173; see also *Ruegg*, *supra*, 63 Cal.App.5th at p. 298 [reviewing "court's role is to 'ensure that the administrative agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choices made, and the purposes of the enabling statute' "].)[7]

Second, in interpreting section 31539, subdivision (a)(2), we observe that "improper" is a word that can have many meanings depending on the context and intent of the speaker. (See, e.g., Merriam-Webster Dict. Online (2021) <https://www.merriam-webster.com/dictionary/improper> [as of Aug. 10, 2021] "not in accord with propriety, modesty, good manners, or good taste"; "not suited to the circumstances, design, or end"; "not in accord with fact, truth, or right procedure"]; Oxford English Dict. (Online ed. 2021) <oed.com/search?searchType=dictionary&q=improper&_searchBtn=Search>

---

[7] Thus, under the express language of the statute, the "discretion" the Legislature has given the Board in subdivision (a) of section 31539 is discretion to correct errors made in the calculation of retired members' pensions in specified circumstances, not to unilaterally decide the meaning of the word "improperly" as used in subdivision (a)(2), without regard for the purpose of the statute. (See § 31539, subd. (a) ["The board of retirement may, in its discretion, correct any error made in the calculation of a retired member's monthly allowance . . . if either of the following exist . . ."].)

19

[as of Aug. 10, 2021] "not in accordance with truth, fact, reason, or rule; abnormal, irregular; incorrect, inaccurate erroneous, wrong"; "unsuitable, unfit, inappropriate, ill-adapted"; "[n]ot in accordance with good manners, modesty or decorum; unbecoming, unseemly; indecorous, indecent"].) Thus, we cannot say that the use of the word "improperly" in the phrase, "caused his or her final compensation to be improperly increased or otherwise overstated at the time of retirement," is, alone, a reliable indicator of legislative intent. (§ 31539, subd. (a)(2).)[8] Rather, because this language is ambiguous, we must look to the legislative history and the historical circumstances behind the statute's enactment for assistance in discerning the Legislature's intent. (See *Klein*, *supra*, 50 Cal.4th at p. 77.)

The legislative history of section 31539 is sparse, but it is sufficient to enable us to perceive both the historical circumstances leading to its enactment, its purpose, and, hence, the Legislature's intent with respect to the meaning of the word "improperly" for purposes of understanding the kinds of conduct encompassed by subdivision (a)(2). Specifically, the legislative history states that when Senate Bill No. 1206 was introduced in 2004, "[a]ccording to the author, several high ranking county officials [had] been prosecuted for crimes or the subject of lawsuits relating to the payment or acceptance of kickbacks in exchange for salary increases which enlarge the 'final salary' upon which [CERL's] county retirement allowances are calculated.

---

[8] Nowicki has not claimed that the word "improperly" or the phrase in which it is used (§ 31539, subd. (a)(2)) is unconstitutionally vague on its face, and we therefore will not address that question. (See *Grayned v. City of Rockford* (1972) 408 U.S. 104, 108 ["It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined"].)

"Even though some of these county officials have settled lawsuits involving the kickbacks and made monetary restitution, the county pensions they receive continue [to] reflect the improper increases. Existing [CERL] law does not contain specific provisions relating to the powers of the county retirement boards to adjust benefit payments when fraud or the overstatement of earnings is discovered." (Assem. Com. on Public Employees, Retirement and Social Security, Analysis of Sen. Bill No. 1206 (2003-2004 Reg. Sess.) as amended Apr. 12, 2004 (Analysis of Sen. Bill No. 1206).)

This legislative history plainly shows that the Legislature was concerned about county retirement boards' inability to correct the pensions of retirees like the officials described, whose recently discovered wrongful conduct was perhaps reachable through criminal actions and/or civil lawsuits but, due to the limits of then existing law, their pensions "continue[d] [to] reflect *the improper increases.*" (Analysis of Sen. Bill No. 1206, *supra*, italics added.) While this evidence of the purpose of section 31539 does not *necessarily* mean that the Legislature intended that the improper conduct in question must always be criminal or otherwise illegal—a question we need not decide here—it unquestionably reflects an intent for subdivision (a)(2) to address actual wrongdoing.[9]

---

[9] The statute's lengthy limitations period (§ 31539, subd. (e)) and the fact that retirement allowance adjustments may be made prospectively *and* retroactively (§ 31539, subds. (b), (c)), provides additional, albeit indirect, support for the conclusion that the Legislature was focused on serious misconduct.

## B. *Application of Section 31539, Subdivision (a)(2) to the Facts of this Case*

Here, the salient facts are uncontroverted.[10] We therefore will independently determine the applicability of subdivision (a)(2) of section 31539 to those facts. (See *McIntyre*, *supra*, 206 Cal.App.4th at p. 179 [interpretation and applicability of a statute are subject to de novo review, with facts reviewed for substantial evidence to extent they are disputed].)

The undisputed facts relied on by the Board and in turn the trial court to find that Nowicki had caused his final compensation to be improperly increased at the time of retirement included the February 6, 2008 first amendment to his original employment contract. Section 5.1 of the first amendment increased Nowicki's salary 7.5 percent, from $173,000 to $186,218.84, and permitted a one-time sell-back of 200 hours of accrued vacation. The salary increase was retroactive to July 10, 2007, exactly one year after the parties entered into the July 10, 2006 contract. Section 5.1 of the original contract contemplated just such an annual increase: "Employee may receive a salary adjustment as determined by the [Fire District] board annually following a performance evaluation."

The first amendment also added section 5.13 to Nowicki's contract, which allowed him to sell back up to 200 hours of accrued vacation leave on a one-time basis by July 9, 2008, retroactive to July 10, 2007. Nowicki then sold back 200 hours of vacation leave on February 8, two days after entering into the first amendment. Although this vacation sell-back provision was not in his original contract, that contract did include a provision stating that

---

[10] The only factual dispute involves whether or not Brown Act violations occurred. However, as we shall discuss, *post*, regardless of who is correct on this point, any alleged violations cannot be imputed to Nowicki in the circumstances of this case.

22

"[t]his Agreement may be amended from time to time only by the mutual written agreement of the parties." In addition, the evidence shows that in his previous role as a battalion chief for the Fire District, Nowicki's contract had included a provision permitting a sell-back of 198 hours of vacation each year, and that Nowicki had utilized that provision to sell back vacation hours every year between 2000 and 2006, until his promotion to fire chief in July 2006.

The undisputed evidence also shows that the provisions of the second amendment, entered into on December 10, 2008, included several changes to the compensation and benefits portion of Nowicki's original employment contract that allowed him to accrue leave at higher rates than he previously had been entitled to, all of which were retroactive to either January 1 or July 1, 2008. These changes included an increase to his rate of accruing paid vacation credit from 20 hours per month to 28 hours per month in amended section 5.5, paid holidays off from work without the prior requirement to use them within a certain period of time in amended section 5.6, the right to convert his annual 80 hours of administrative leave to vacation leave in amended section 5.12, and the right to sell back up to 260 hours of accrued vacation leave annually in section 5.13.

Unlike with the first amendment to his employment contract, there is evidence in the record that at the time Nowicki entered into the second amendment on December 10, 2008, he knew that he would retire in January 2009. For example, in an October 20, 2008 email to a CCCERA employee, Nowicki referred to an upcoming meeting with her and mentioned a question he had that "we already talked about a little." He noted that he had sold back 200 hours of vacation in February 2008, and added that "I want to be able to include that sell-back amount in my final calculations along with another vacation sell-back that I will do shortly," and then asked, "can I

23

retire in the first week of January and still utilize my last vacation sell-back for my retirement totals?"

The evidence also shows that on November 25, 2008, Nowicki informed CCCERA both of his intent to retire on January 30, 2009, and that he announced his retirement to Fire District staff on December 13, three days after entering into the second amendment. He then converted his administrative leave to vacation leave and sold back 60 hours of vacation leave on December 31, which brought his total 2008 vacation leave sell-backs to 260 hours, the maximum permitted annually under one of the changes contained in the second amendment. Then, by waiting until January 5, 2009, to sell back 260 additional hours of vacation leave, he was able to include separate years of maximum vacation sell-backs to increase his final pensionable compensation, a practice known as "straddling." He also sold back 104 hours of accrued floating holidays, the compensation from which was included in his final compensation for purposes of determining his retirement allowance.

All of these acts, which were permitted under the added terms of the two amendments to Nowicki's contract, ultimately led to an increase to his compensation earnable during the final year of his employment. According to CCCERA, this evidence thus supports its finding that he "caused his final compensation to be improperly increased at the time of retirement," leading to a significantly inflated retirement allowance. (See § 31539, subd. (a)(2).)

The primary problem with CCCERA's argument is that in 2008 and 2009, when Nowicki and the Fire District entered into the two amendments to his contract as fire chief, and when he sold back leave during the year before his retirement—including timing the sell-backs to straddle two

24

calendar years[11]—his conduct was permitted under the relevant law, and also reflected in CCCERA guidelines.

First, as explained in *Alameda County*, before the 2012 amendments to section 31461, our Supreme Court had held "that the statutory definition of 'compensation' in section 31460 includes all cash compensation paid to an employee, regardless whether the cash represented the value of an in-kind benefit or constituted premium pay not received by all of the employee's peers. (*Ventura County* [*Deputy Sheriff's Assn. v. Board of Retirement* (1997) 16 Cal.4th 483,] 496–499.) Because such 'compensation' is the basis for compensation earnable, these general holdings from *Ventura County* have guided the determination of compensation earnable under CERL since the decision's issuance in 1997." (*Alameda County*, *supra*, 9 Cal.5th at p. 1059; see *id.* at p. 1061 ["A review of the exclusions and limitations in PEPRA's amendment of section 31461 demonstrates that the Legislature sought to limit pension spiking by eliminating practices that, while arguably permitted under the broad language of the preexisting definition, are inconsistent with the statute's overall concept of compensation earnable"].)

Second, at the time of Nowicki's retirement, CCCERA's guidelines for determining which pay items were to be considered "compensation includible" in the calculation of an employee's retirement allowance provided that "[t]he value of accrued time, such as vacation, holiday or sick leave, that is sold back to the employer by the employee each year under a 'cash-out'

---

[11] In *Alameda County*, our Supreme Court described this former practice of selling back vacation leave in two years: "Prior to PEPRA's amendment, even in counties that limited the amount of leave time that could be cashed out in a calendar year, employees were able to double the amount of cashed out leave time received during a final compensation year by designating a final compensation year that straddles two calendar years . . . ." (*Alameda County*, *supra*, 9 Cal.5th at pp. 1062–1063.)

agreement, is includible in compensation earnable" for purposes of determining the amount of the retiring employee's pension. This policy was based on the former construction of compensation earnable under CERL, which our Supreme Court had interpreted in *Ventura County Deputy Sheriff's Assn. v. Board of Retirement, supra,* 16 Cal.4th 483 (*Ventura County*) to mean that "[w]hen an employee elects to receive cash in lieu of accrued vacation and the wages or salary the employee would receive during the vacation period, the cash, like the vacation pay the employee would otherwise receive, is part of the employee's 'remuneration' for past services," and would be considered "compensation" for purposes of calculating a retiring employee's retirement allowance. (*Ventura County*, at pp. 497–498.)[12]

It is striking that the Board initiated the lookback project to investigate possible instances of pension spiking by retired members in 2013, shortly after the effective date of PEPRA.[13] The Board then looked to the new limitations on compensation earnable in amended section 31461, which took effect in 2013 and applied *prospectively only* (*Alameda County, supra*, 9 Cal.5th at p. 1092; *Marin County, supra*, 2 Cal.App.5th at p. 705 ["the Legislature's intent in amending section 31461 was to make it *illegal after January 1, 2013*, for the enumerated items and payments to figure in compensation earnable and the calculation of final compensation"], italics

---

[12] As noted, upon the subsequent enactment of PEPRA, section 31461, subdivision (b)(2) was amended to reverse this rule. (See *Alameda County, supra*, 9 Cal.5th at p. 1059.)

[13] Indeed, at the hearing to determine whether Nowicki had violated section 31539, the Board counsel's PowerPoint stated that after amendments to section 31461 in 2013, "the CCCERA Board directed staff to 'look back' and review unusual career-end behavior resulting in spikes to pensionable compensation for pre-[PEPRA amendment] retirees" under the [n]ew statutory authority."

added), to conclude that Nowicki had improperly caused his retirement allowance to be increased at the time of his retirement in 2009, when what he did was still explicitly permitted under then-existing law; and the Board did all this pursuant to section 31539, a statute enacted in 2004 for a different purpose. In other words, the Board applied PEPRA standards to a situation to which PEPRA has no application.

The Board nevertheless argues that the fact that Nowicki negotiated the two amendments with the Fire District board in secret provides evidence of his improper conduct. The Board's counsel stated in his August 4, 2015 memorandum that the "facts indicate[d] that Nowicki knowingly and intentionally obtained substantial additional compensation through a process designed specifically to thwart public scrutiny of the arrangements." In its order, the trial court found that "[a]dditional support for the Board's decision is found in the fact that the alterations to [Nowicki's] compensation were negotiated in closed sessions of the [Fire District's] board, which contravenes the Brown Act."

The intent of the Brown Act is for the deliberations of public bodies in California to be conducted openly and for their actions to be taken openly. (§ 54950.) Under the Brown Act, closed sessions are permitted for the evaluation of a public employee's performance, but not for "discussion or action on proposed compensation except for a reduction of compensation that results from the imposition of discipline." (§ 54957, subd. (b)(1), (b)(4); see *San Diego Union v. City Council* (1983) 146 Cal.App.3d 947, 955 ["personnel exception" in section 54957 does not include discussion of salaries and other terms of compensation].)

Here, the parties disagree as to whether the evidence shows that Nowicki was present in closed sessions during which the full Fire District

27

board discussed the possible amendments to his contract. We need not resolve that dispute because, regardless of whether Nowicki was present, the evidence of those closed sessions is insufficient to show impropriety on the part of Nowicki. Moreover, the evidence reflects that the Fire District's attorney was in attendance at such closed sessions to ensure compliance with the Brown Act. Accordingly, the imputation of improper motives to *Nowicki*, and the Board's finding that he actively caused the discussions to be held in closed session in order to evade public scrutiny as the Board's counsel suggested, was based on conjecture rather than on the evidence in the record. (See *California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 45 [" ' " ' "A finding of fact must be an inference drawn from evidence rather than [from] a mere speculation as to probabilities without evidence" ' " ' "].)[14]

CCCERA also argues that the retroactivity of the provisions in both amendments to Nowicki's contract provided evidence of impropriety to support the Board's decision. However, the evidence shows that the annual review process was delayed with respect to both amendments, which was apparently a regular occurrence at the Fire District. For example, as to the first amendment, meeting agendas for December 3, 2007, December 17, 2007, and January 6, 2008, all stated that the Fire District's board planned to "discuss Chief Nowicki's performance evaluation and process" in closed session. Likewise, as to the second amendment, in a July 15, 2008 memorandum to Nowicki, the Fire District board stated that the board had

---

[14] Moreover, to the extent the Board relied on certain Fire District board members' statements to the media about closed session negotiations, such statements of individuals who did not testify at the September 9, 2015 hearing could not properly be considered evidence establishing impropriety on the part of Nowicki.

met several times to evaluate the terms and conditions of Nowicki's continued employment and that those "deliberations are continuing, but will hopefully conclude shortly with specific recommendations and actions." Obviously, any adjustments to Nowicki's compensation could not be determined until *after* the Fire District board completed its evaluations.

Hence, the Board's reliance on the prohibition against extra compensation in finding that Nowicki improperly received retroactive remuneration is unpersuasive. That prohibition, embodied in article XI, section 10, subdivision (a) of the California Constitution, provides in relevant part: "A local government body may not grant extra compensation or extra allowance to a public officer, public employee, or contractor after service has been rendered or a contract has been entered into and performed in whole or in part . . . ." Our Supreme Court has explained that this "provision 'denied to the Legislature the right to make direct appropriations to *individuals* from general considerations of charity or gratitude, or because of some supposed moral obligation. . . .' " (*Jarvis v. Cory* (1980) 28 Cal.3d 562, 577.) The court also stated however, that "the extra compensation clause is not offended when state employees receive retroactive salary adjustments for periods during which they worked with justifiable uncertainty regarding their salary levels." (*Id.* at p. 579; accord, *County of Orange v. Association of Orange County Deputy Sheriffs* (2011) 192 Cal.App.4th 21, 40.)

Here, the evidence shows that both amendments to Nowicki's contract were entered into a short time after the delayed evaluations and related decisions regarding the terms and conditions of his continued employment as fire chief were complete, and that their provisions applied retroactively to the time at which the changes would have gone into effect had the process not been delayed. That Nowicki and the Fire District actually entered into the

29

second amendment after Nowicki had announced to CCCERA staff his intent to retire does not alter the fact that the retroactive changes to his contract were not based on "charity or gratitude" but, instead, were made to compensate him for work already performed. (*Jarvis v. Cory*, *supra*, 28 Cal.3d at p. 577.) Hence, the undisputed evidence does not support the Board's finding that the Fire District was giving Nowicki "extra compensation" when it entered into the two amendments to his contract. (Cal. Const., art. XI, § 10, subd. (a).)

In short, considering the legislative history of section 31539 and the law in existence at the time of Nowicki's retirement, we conclude the Board erroneously interpreted subdivision (a)(2) as applicable to Nowicki. In giving county retirement boards the discretion to correct errors made in the calculation of the retirement allowance of a retired member who "caused his or her final compensation to be improperly increased or otherwise overstated at the time of retirement" (§ 31539, subd. (a)(2)), it simply is not plausible that the Legislature intended to empower retirement boards to target long retired county employees who had negotiated with their employer for contract terms permitted under then-existing law and county retirement association guidance, solely because those acts enabled them to increase their final compensation at the time of retirement. (See Analysis of Sen. Bill No. 1206, *supra*; cf. *Klein*, *supra*, 50 Cal.4th at p. 77 [reviewing court may consider likely effects of a proposed interpretation of a statute "because ' "[w]here uncertainty exists, consideration should be given to the consequences that will flow from a particular interpretation" ' "].)

We recognize that Nowicki's pre-retirement efforts to increase his compensation earnable in the period before his retirement, which allowed him to maximize his pension, epitomize pension spiking, a practice that led to

30

the subsequent enactment of PEPRA.  (See *Alameda County*, *supra*, 9 Cal.5th at p. 1063.)  Nevertheless, we cannot sanction the Board's legally unsupported use of section 31539 to penalize Nowicki for conduct that—while *now* prohibited under PEPRA—was expressly permitted at the time of his retirement.  (See *Alameda County*, at p. 1092; *Ventura County*, *supra*, 16 Cal.4th at pp. 497–498.)

For the reasons discussed in this opinion, we conclude the Board's determination that Nowicki caused his pension to be improperly increased at the time of retirement, pursuant to subdivision (a)(2) of section 31539 was not " ' "in conformity with the spirit of the law," ' "and did not " ' "subserve . . . substantial justice." ' " (*Jacobs*, *supra*, 156 Cal.App.4th at pp. 737–738.)  Its decision therefore constituted an abuse of discretion.  (See *Ruegg*, *supra*, 63 Cal.App.5th at p. 298.)  Accordingly, the trial court's judgment denying Nowicki's petition for writ of mandate must be reversed.[15]

## DISPOSITION

The judgment is reversed.  Peter J. Nowicki is awarded his costs on appeal.

---

[15] In light of this conclusion, we need not address Nowicki's contention that the trial court ignored significant procedural errors by the Board that violated his due process rights.

_____
KLINE, P.J.

WE CONCUR:


_____
RICHMAN, J.


_____
MILLER, J.


*Nowicki v. Contra Costa County Employees' Retirement Association* (A160337)

Trial Court:                    Contra Costa County Superior Court

Trial Judge:                    Hon. Charles B. Burch

Attorney for Appellant:         Messing Adam & Jasmine
                                Steven Kaiser

Attorneys for Respondent:       Reed Smith
                                Harvey L. Leiderman
                                Maytak Chin